**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION**

| | |
|---|---|
| GEORGIA-PACIFIC CONSUMER PRODUCTS LP, ) <br> FORT JAMES CORPORATION, and ) <br> GEORGIA-PACIFIC LLC, ) <br> ) <br>              Plaintiffs, ) <br>     v. ) <br> ) <br> NCR CORPORATION and ) <br> INTERNATIONAL PAPER CO., ) <br> ) <br>           Defendants. ) | Civil Action No. 10-C-1087 |

---

**DEFENDANT NCR CORPORATION'S ANSWER AND AFFIRMATIVE DEFENSES TO
THE COMPLAINT OF PLAINTIFFS' GEORGIA-PACIFIC CONSUMER PRODUCTS
LP, FORT JAMES CORPORATION AND GEORGIA-PACIFIC LLC**

---

## ANSWER

Defendant NCR Corporation ("NCR"), by and through its undersigned counsel, as its

Answer to the Complaint brought by Georgia-Pacific Consumer Products LP, Fort James

Corporation and Georgia Pacific LLC (collectively, the "Plaintiffs" or "GP"), states as follows:

1.      This civil action is brought pursuant to the Comprehensive Environmental
Response, Compensation, and Liability Act, as amended by the Superfund Amendments and
Reauthorization Act of 1986, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), also known as Superfund.

**ANSWER:**    NCR admits that GP purports to bring a civil action pursuant to the

Comprehensive Environmental Response, Compensation and Liability Act, as amended by the

Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601 *et seq.*

("CERCLA"), also known as Superfund.  NCR denies any remaining allegations set forth in

Paragraph 1.

1

2.     This case is about allocating responsibility for contamination of the Allied Paper Inc./Portage Creek/Kalamazoo River Superfund Site ("Kalamazoo River Superfund Site" or "the Site") in southwestern Michigan.  The Site is contaminated with "polychlorinated biphenyls," better known as PCBs, a hazardous substance and possible human carcinogen.  The primary PCB contaminant at issue at the Kalamazoo River Superfund Site is known as Aroclor 1242.

**ANSWER:**     NCR admits that GP purports to seek the allocation of responsibility for

contamination at the Allied Paper Inc./Portage Creek/Kalamazoo River Superfund Site (the

"Kalamazoo Site") in Southwestern Michigan.  NCR specifically denies any liability relating to

the Kalamazoo Site.  NCR states that it is without knowledge or information sufficient to form a

belief regarding the truth of the allegations set forth in the second and third sentences of

Paragraph 2.

3.     Beginning no later than 1954, and lasting at least through 1971, PCBs were released into the Kalamazoo River (and connected Portage Creek, which flows directly into the Kalamazoo River) in part through the past discharge, release, and disposal of PCB-contaminated solids and paper residuals by paper de-inking and recycling companies.  The fact that the waste paper contained PCBs was unknown to the paper de-inking and recycling companies during this period of time.

**ANSWER:**     NCR admits that GP and certain other potentially responsible parties

("PRPs") unrelated to NCR have been found to be responsible for the discharge, release and/or

disposal of materials containing polychlorinated biphenyls ("PCBs") at the Kalamazoo Site.

NCR states that it is without knowledge or information sufficient to form a belief regarding the

truth of the remaining allegations set forth in Paragraph 3.

4.     PCBs were released into the Kalamazoo River because waste paper that was de-inked and/or recycled by companies near the Kalamazoo River included PCB-laden "broke" and "trim."  Broke and trim were wastes that resulted from the manufacture of proprietary, PCB-coated "carbonless copy paper" ("CCP") pioneered by Defendant NCR Corporation.

**ANSWER:**     NCR denies the allegations contained in Paragraph 4, except admits that

NCR produced an emulsion that was used by certain paper coating companies in the production

of CCP, and that the production of CCP could result in the creation of certain valuable products

known as "broke" and "trim", which could be sold for value.

2

5. Contamination from the PCB-laden broke and trim has made large segments of the Kalamazoo River an "NCR river," with NCR CCP being the source of the PCB-contaminated sediments that require remediation at the Kalamazoo River Superfund Site.

**ANSWER:** NCR denies the allegations set forth in Paragraph 5.

6. If it were not for NCR's use of PCBs in its CCP, and if not for the contamination of the Kalamazoo River by PCB Aroclor 1242 attributable to NCR broke and trim, the Kalamazoo River would not have been listed as a Federal Superfund site.

**ANSWER:** NCR denies the allegations set forth in Paragraph 6.

7. Georgia-Pacific brings this lawsuit to (1) establish the liability of Defendants under CERCLA for the PCB contamination of the Kalamazoo River Superfund Site, (2) determine Defendants' equitable shares of the costs of cleaning up the Kalamazoo River Superfund Site, and (3) require Defendants to pay their fair portion of past and future cleanup costs associated with the Kalamazoo River Superfund Site.

**ANSWER:** NCR admits that GP requests the relief set forth in Paragraph 7. NCR specifically denies that GP is entitled to such relief, and denies any remaining allegations in Paragraph 7.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this Complaint pursuant to 42 U.S.C. § 9601 *et seq.* and 28 U.S.C. § 1331.

**ANSWER:** NCR admits the allegations set forth in Paragraph 8.

9. Venue is proper under 28 U.S.C. § 1391(b) and 42 U.S.C. § 9613(b), because: (a) the events giving rise to the claims asserted in this Complaint are based on the paper-processing activities that took place in this District; (b) each of the Defendants does business in the District; (c) claims in this action arise from many of the same activities by the Defendants which are at issue in the case of *Appleton Papers, Inc. and NCR Corporation v. George A. Whiting Paper Company*, No. 08-CV-00016-WCG, brought by NCR and others, in this jurisdiction, for costs associated with the investigation and remediation of the PCB contamination in Fox River; and (d) the Defendants made arrangements in this District with brokers that ultimately resulted in the release of PCBs into the Kalamazoo River.

**ANSWER:** NCR denies the allegations set forth in Paragraph 9, except admits that NCR does business in the Eastern District of Wisconsin. NCR further states that venue is proper and more appropriate in the Western District of Michigan, and that transfer to the Western

3

District of Michigan would best serve the interests of justice and the convenience of the parties and witnesses, because the alleged events that purportedly give rise to GP's claims occurred in the Western District of Michigan and related litigation has been ongoing in that District for over two decades. To the extent that Paragraph 9 asserts allegations against other parties, NCR states that no response is required from NCR.

10. Venue also is proper pursuant to 28 U.S.C. § 1391(c), because each Defendant is subject to personal jurisdiction in this District.

**ANSWER:** NCR states that it is without knowledge or information sufficient to form a belief regarding the truth of the allegations set forth in Paragraph 10, except admits that NCR is subject to personal jurisdiction in this District.

<u>PARTIES</u>

11. Georgia-Pacific is the corporate successor to Kalamazoo-area facilities that de-inked and recycled PCB-containing NCR broke and trim. Georgia-Pacific, to date, has paid in excess of $79 million to investigate and remediate the Kalamazoo River Superfund Site.

**ANSWER:** NCR states that it is without knowledge or information sufficient to form a belief regarding the truth of the allegations set forth in Paragraph 11.

4

12.     Defendant NCR Corporation ("NCR") invented the PCB-containing CCP that has caused the PCB contamination of the Kalamazoo River Superfund Site.  NCR arranged for the disposal of PCB-laden waste from its own CCP converting operations.  NCR also arranged for the disposal of PCB-laden broke and trim from its "contract coaters," companies that coated NCR's paper according to NCR's specifications, using an emulsion consigned to them by NCR.  NCR is also the corporate successor to at least two coaters — the Wisconsin-based Appleton Coated Paper Company ("ACPC"), and Combined Paper Mills, Inc. (also known as the "Combined Locks Mill") — that arranged for the disposal of PCB-laden broke and trim resulting from the coating of NCR CCP.  Waste paper from all these activities was recycled at facilities near the Kalamazoo River, with resulting releases of PCBs into the Kalamazoo River.  NCR has paid nothing toward the cleanup of the Kalamazoo River Superfund Site.  On or about November 24, 2010, the United States Environmental Protection Agency ("EPA") issued a General Notice letter to NCR informing the company that it may be liable for PCB contamination of the Kalamazoo River because NCR arranged for the disposal, treatment, or transportation of hazardous substances at the Site.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 12, except admits that (i) NCR developed a product called "carbonless copy paper", or CCP, which for a certain period of time was produced using an emulsion that contained certain amounts of Aroclor 1242, a type of PCB; (ii) NCR acquired Combined Paper Mills, Inc. ("Combined Paper"), located in Combined Locks, Wisconsin, in or about 1969; (iii) NCR acquired Appleton Coated Paper Company ("ACPC"), located in Appleton, Wisconsin, in or about 1970; and (iv) NCR sold its ownership interest in Combined Paper and ACPC in or about June 1978, to Appleton Papers, Inc. ("API").  NCR further admits that NCR has not incurred costs for cleanup at the Kalamazoo Site to date, and that on or about November 24, 2010, the U.S. Environmental Protection Agency ("EPA") issued a General Notice Letter to NCR, attached to the Complaint as Exhibit A, and NCR refers to the General Notice Letter for its contents.

13.     Defendant International Paper Co. ("IP") is the corporate successor to St. Regis Paper Company ("St. Regis") - an entity that itself disposed of large volumes of PCBs into the Kalamazoo River, and that later leased its polluting plant and equipment to a company that continued disposal practices that resulted in the release of PCBs into the Kalamazoo River Superfund Site.  IP has paid nothing toward the cleanup of the Kalamazoo River Superfund Site. On or about November 24, 2010, the EPA issued a General Notice Letter to IP informing the company that it may be liable for PCB contamination of the Kalamazoo River by virtue of its status as a past owner and/or operator of a facility from which PCBs were released at the Site.

        **ANSWER:**     NCR states that Paragraph 13 asserts allegations against other parties to

which no response is required from NCR.  To the extent that allegations in Paragraph 13 require

a response from NCR, NCR denies those allegations.

<u>FACTS</u>

**I.      The Kalamazoo River Superfund Site**

        14.     Based upon studies conducted between 1972 and 1989, the Michigan Department of Natural Resources ("MDNR") determined that certain areas in and around the Kalamazoo River below Morrow Dam were contaminated with PCBs.

        **ANSWER:**     NCR admits the allegations set forth in Paragraph 14.

        15.     The Allied Paper Inc./Portage Creek/Kalamazoo River Superfund Site was declared a Federal Superfund site by the United States Environmental Protection Agency in August 1990.  The Site was placed on the National Priority List ("NPL") as a Superfund Site pursuant to CERCLA § 105, 42 U.S.C. § 9605.  In 1990, the Site also was listed by the MDNR as an environmental contamination site under the Michigan Environmental Response Act ("Act 307"), M.C.L. §§ 299.601 *et seq.*

        **ANSWER:**     NCR admits the allegations set forth in Paragraph 15.

        16.     EPA has identified Georgia-Pacific as a "potentially responsible party" ("PRP") at the Kalamazoo River Superfund Site.  Georgia-Pacific is now the only remaining PRP left at the Site to provide ongoing funding to investigate and remediate the PCB contamination of the Kalamazoo River, due to the bankruptcies of other PRPs at the Kalamazoo River Superfund Site. (Only one other company, Weyerhaeuser Company, is currently involved in remedial activity, and it is only funding measures to remediate a landfill it owned, and to investigate and remediate a former paper mill it owned.)

        **ANSWER:**     NCR admits that EPA has identified GP as a PRP at the Kalamazoo Site,

and that GP and certain other PRPs unrelated to NCR have been found to be responsible for the

discharge, release and/or disposal of PCBs at the Kalamazoo Site.  NCR states that it is without

6

knowledge or information sufficient to form a belief regarding the truth of the remaining

allegations set forth in Paragraph 16.

17. PCBs were introduced to Portage Creek and the Kalamazoo River largely through past discharges, releases, and disposal of PCB-contaminated solids and paper residuals by paper-manufacturing operations on Portage Creek and the Kalamazoo River.

**ANSWER:** NCR states that it is without knowledge or information sufficient to form a

belief regarding the truth of the allegations set forth in Paragraph 17, except admits that GP and

certain other PRPs unrelated to NCR have been found to be responsible for the discharge, release

and/or disposal of PCBs at the Kalamazoo Site.

18. The Kalamazoo River Superfund Site currently includes five disposal areas, four paper mill properties, an approximately 80-mile stretch of the Kalamazoo River from Morrow Dam to Lake Michigan, and a three-mile stretch of Portage Creek.

**ANSWER:** NCR admits the allegations set forth in Paragraph 18.

19. EPA has divided the site into various cleanup projects known as "Operable Units."

**ANSWER:** NCR admits the allegations set forth in Paragraph 19.

20. One of the areas requiring remediation is the Allied Paper/Bryant Mill Pond Operable Unit. This area has been classified as Operable Unit 1. At this Operable Unit, a Remedial Investigation Report was developed by the State of Michigan and approved by EPA in March 2008. A groundwater investigation was undertaken in the summer of 2009. EPA will be selecting a proposed cleanup plan for this Operable Unit.

**ANSWER:** NCR states that it is without knowledge or information sufficient to form a

belief regarding the truth of the allegations set forth in Paragraph 20, except admits that EPA has

identified one area of the Kalamazoo Site as Operable Unit 1.

7

21.     Another area requiring remediation is the Willow Boulevard/A-Site Landfill. This area has been classified as Operable Unit 2.  The Remedial Investigation/Feasibility Study ("RI/FS") for this site was overseen by the State of Michigan.  In a Record of Decision issued in 2006, EPA selected a remedy for this Operable Unit.  In September 2009, a consent decree between EPA and Georgia-Pacific for design and cleanup at the Willow Boulevard/A-Site Landfill was approved by a Federal District Court.  This settlement, among other things, obligates Georgia-Pacific to consolidate waste materials, construct a permanent landfill cap, and install a groundwater monitoring system.

**ANSWER:**     NCR states that it is without knowledge or information sufficient to form a belief regarding the truth of the allegations set forth in Paragraph 21, except admits that EPA has identified one area of the Kalamazoo Site as Operable Unit 2.

22.     Operable Unit 3 is the King Highway Landfill.  The remedy for this Operable Unit involves the construction of a landfill cap, the seeding of the cap with vegetative growth, and the construction of a gas collection trench.  The King Highway Landfill remains under the control of the State of Michigan and construction work is ongoing.

**ANSWER:**     NCR states that it is without knowledge or information sufficient to form a belief regarding the truth of the allegations set forth in Paragraph 22, except admits that EPA has identified one area of the Kalamazoo Site as Operable Unit 3.

23.     Operable Unit 4 is the Twelfth Street Landfill.  In September 2001, EPA signed a Record of Decision for the Twelfth Street Landfill.  The remedy includes excavation of PCB residuals that have migrated from the landfill and placement of those residuals back in the landfill.  This work is ongoing and is being conducted by Weyerhaeuser with oversight by EPA and MDNR.

**ANSWER:**     NCR states that it is without knowledge or information sufficient to form a belief regarding the truth of the allegations set forth in Paragraph 23, except admits that EPA has identified one area of the Kalamazoo Site as Operable Unit 4.

8

24.     Operable Unit 5 concerns the Portage Creek and Kalamazoo River sediments.  In February 2007, EPA reached two settlement agreements ("AOCs") with Millennium Holdings LLC (which has since gone bankrupt) and with Georgia-Pacific.  These AOCs were the result of two years of mediated negotiations between the PRPs and various government regulators and entities, including the EPA and the State of Michigan.

        **ANSWER:**     NCR states that it is without knowledge or information sufficient to form a

belief regarding the truth of the allegations set forth in Paragraph 24, except admits that EPA has

identified one area of the Kalamazoo Site as Operable Unit 5.

25.     Under an AOC for a "Removal Action," No. VW-07-C-863, Georgia-Pacific and Millennium agreed to perform sediment excavation in the Kalamazoo River near Plainwell, Michigan.  Under an AOC for a "Remedial Investigation/Feasibility Study," No. VW-07-C-864, Georgia-Pacific and Millennium agreed to conduct a Supplemental RI/FS on the 80-mile stretch of the Kalamazoo River from Morrow Dam to Lake Michigan and Portage Creek from Cork Street to the confluence with the Kalamazoo River.

        **ANSWER:**     NCR states that it is without knowledge or information sufficient to form a

belief regarding the truth of the allegations set forth in Paragraph 25.

## II.     Georgia-Pacific's Expenditures to Clean Up the Kalamazoo River Superfund Site

26.     As of the date of this Complaint, Georgia-Pacific has incurred significant costs to investigate and remediate the Kalamazoo River Superfund Site, and to investigate the liability of other potentially responsible parties, such as NCR and IP.  The response costs total at least $79 million as of the date of this Complaint.

        **ANSWER:**     NCR states that it is without knowledge or information sufficient to form a

belief regarding the truth of the allegations set forth in Paragraph 26.  NCR specifically denies

any liability in connection with the Kalamazoo Site.

27.     The cleanup of the Kalamazoo River Superfund Site is not complete, and substantial work remains to be done.  Georgia-Pacific will be required to spend a significant amount of money in the future to investigate and remediate the Site.

        **ANSWER:**     NCR states that it is without knowledge or information sufficient to form a

belief regarding the truth of the allegations set forth in Paragraph 27.

III.     **The Contaminated Kalamazoo is an "NCR River"**

A.     **The Development of PCB-Contaminated Paper by NCR**

28.     Monsanto Chemical Company ("Monsanto") developed and manufactured a PCB called Aroclor 1242.  (The first two digits refer to the number of carbon atoms, 12, and the second two numbers indicate the percentage of chlorine by mass in the mixture, 42 percent.) PCB Aroclor 1242 is a stable compound that does not easily degrade.  It is now considered a hazardous substance and a possible human carcinogen.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 28, except admits that:

(i) Monsanto developed and manufactured a solvent called Aroclor 1242, for which the first two

digits in the name indicate the number of carbon atoms in the biphenyl compound and the last

two digits indicate the average percentage of chlorine content by weight in the mixture, (ii)

Aroclor 1242 is a type of PCB, and (iii) Aroclor 1242 is now considered a hazardous substance.

29.     No later than 1947, the National Cash Register Corporation (predecessor to NCR) began experimenting with and testing a variety of PCBs, including Aroclor 1242, to be used in CCP.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 29, except admits that

the National Cash Register Company was a predecessor to NCR, and that in or about the late

1940s, the National Cash Register Company began testing the compatibility of various solvents

(including Aroclor 1242) with certain coatings used to produce CCP.

30.     NCR ultimately decided to use Aroclor 1242 as a component of the emulsion that gave CCP its unique characteristics.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 30, except admits that at

certain times between 1954 and April 1971, the emulsion used in the production of CCP

contained certain amounts of Aroclor 1242.

10

31.    To make its CCP, NCR placed this emulsion between two sheets of paper.  The emulsion contained microscopic dye capsules that burst when pressed (by a pen or typewriter, for instance), creating a copy on the second sheet of paper of the markings on the top sheet of paper, without using carbon paper between the two sheets of paper.  These microcapsules were dissolved in PCB Aroclor 1242.

**ANSWER:**    NCR denies the allegations set forth in Paragraph 31, except admits that the emulsion used in the production of CCP contained microcapsules that could burst when pressed, and that such pressure could result in a copy of any markings made on the top sheet of CCP.

32.    PCB Aroclor 1242 was not incidental to NCR's CCP — it was a crucial element for the manufacture of this product.

**ANSWER:**    NCR denies the allegations set forth in Paragraph 32, except admits that at certain times between 1954 and April 1971, the emulsion used in the production of CCP contained certain amounts of Aroclor 1242.

33.    NCR commenced commercial production and sale of its CCP no later than March 1952.  NCR's CCP proved to be a convenient and popular product in the business world, where forms and other documents were routinely made in duplicate.  NCR's CCP became a profitable product line for the company.

**ANSWER:**    NCR denies the allegations set forth in Paragraph 33, except admits that NCR began selling CCP in or about 1954, and that CCP was a profitable product for NCR.

**B.    The Manufacture of NCR CCP: Coating**

34.    The PCB-containing CCP emulsion was manufactured by NCR at plants located in Dayton, Ohio, from 1953 through 1971, and Portage, Wisconsin, from 1968 through 1971.

**ANSWER:**    NCR denies the allegations set forth in Paragraph 34, except admits that, at certain times, plants owned by NCR in Dayton, Ohio, and Portage, Wisconsin, manufactured the emulsion used in the production of CCP.

35.     NCR then had third parties coat the paper with the PCB-containing emulsion to make bulk CCP.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 35, except admits that, starting in or about 1954, NCR sold the emulsion used in the production of CCP to certain paper coating companies, which used that emulsion to manufacture CCP, and that NCR subsequently purchased finished CCP from those paper coating companies.

36.     These third parties were known variously as "toll coaters," "production subcontractors," or "contract coaters" (hereinafter "contract coaters").

**ANSWER:**     NCR denies the allegations set forth in Paragraph 36.

37.     NCR's contract coaters coated NCR CCP with NCR's proprietary emulsion according to NCR's confidential specifications.  At all times, NCR retained ownership of the PCB-containing emulsion, with the emulsion being given to the contract coaters on consignment.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 37, except admits that, starting in or about 1954, NCR sold the emulsion used in the production of CCP to certain paper coating companies, which used that emulsion to manufacture CCP, and that NCR subsequently purchased finished CCP from those paper coating companies that conformed to NCR's requested specifications.

38.     ACPC and the Combined Locks Mill (both in Wisconsin) acted as contract coaters for NCR, as did Mead Corporation (in Chillicothe, Ohio).  Between at least 1954 and 1971, substantial quantities of NCR's CCP was coated by one or more of these entities, using NCR's PCB-laden emulsion.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 38, except admits that (i) between 1954 and April 1971, ACPC produced CCP at its Appleton, Wisconsin plant by coating base paper with an emulsion that it purchased from NCR; (ii) at certain times between 1955 and April 1971, Mead Corporation produced CCP at its Chillicothe, Ohio plant by coating base paper with an emulsion that it purchased from NCR; and (iii) from approximately 1969

until April 1971, Combined Paper produced CCP at its Combined Locks, Wisconsin plant by coating base paper with an emulsion that it purchased from NCR.

39.     ACPC and Mead coated NCR's CCP from at least 1954 to 1971.  The Combined Locks Mill coated CCP for NCR at various times between 1964 and 1971.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 39, except admits that (i) between 1954 and April 1971, ACPC produced CCP at its Appleton, Wisconsin plant by coating base paper with an emulsion that it purchased from NCR; (ii) at certain times between 1955 and April 1971, Mead Corporation produced CCP at its Chillicothe, Ohio plant by coating base paper with an emulsion that it purchased from NCR; and (iii) from approximately 1969 until April 1971, Combined Paper produced CCP at its Combined Locks, Wisconsin plant by coating base paper with an emulsion that it purchased from NCR.

### C.     The Manufacture of NCR CCP: Converting

40.     After the CCP had been coated with NCR's proprietary PCB-containing emulsion, the coated bulk rolls or sheets of CCP could then be "converted," *i.e.*, turned into the finished product — business forms.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 40, except admits that coated rolls or sheets of CCP could be converted into finished paper products, including business forms.

41.     Some bulk CCP was used by NCR in its own paper-converting operations.  Those operations included at least 13 different paper-converting facilities around the country from 1954 to 1971.  These facilities were part of NCR's "Supply Manufacturing" or "Business Forms and Supply Division," later known as "Systemedia."  Through these operations, NCR sold business forms for its own account.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 41, except admits that at certain times NCR owned plants that converted CCP into business forms and other paper products that NCR sold to customers, and that those converting plants were at certain times

referred to as part of NCR's Supply Manufacturing Division, Business Forms and Supply

Division or Systemedia.

42.     Other bulk CCP was sold by NCR to NCR customers. These customers —
independent converters — then used the bulk CCP to manufacture their own business forms.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 42, except admits that at

certain times NCR sold bulk CCP to certain paper converting plants that, on information and

belief, used that bulk CCP to manufacture business forms.

### D.     The Generation of PCB-Laden CCP Waste

43.     NCR's coating specifications required the paper coater to test samples of the NCR
Paper and to scrap any CCP that failed to meet a set of minimum quality requirements.
Off-specification CCP needed to be disposed of and could not be shipped to NCR Paper
customers. The coating process would also generate CCP scrap from roll ends, broken rolls, and
folded rolls during paper machine breaks.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 43, except admits that

NCR ordered CCP that conformed to requested specifications, and that the production of CCP

could result in the creation of certain valuable products known as "broke" and "trim", which

could be sold for value.

44.     Similarly, when customers used the rolls of NCR CCP to make business forms,
there would be cutting and trimming that would result in unusable scrap paper.

**ANSWER:**     NCR states that it is without knowledge or information sufficient to form a

belief regarding the truth of the allegations set forth in Paragraph 44, except states that CCP trim

was a valuable product that could be sold for value.

45.     Collectively, the scrap generated from the CCP coating and converting processes
was called "broke" and/or "trim."

**ANSWER:**     NCR denies the allegations set forth in Paragraph 45, except admits that

the production of CCP could result in the creation of certain valuable products known as "broke"

and "trim", which could be sold for value.

46. At all times, NCR knew and understood that the CCP coating and conversion processes created significant amounts of waste paper that was coated with NCR's PCB-containing emulsion. NCR tracked its coaters' generation of CCP broke and sought to minimize their broke generation.

**ANSWER:** NCR denies the allegations set forth in Paragraph 46, and states that CCP broke and trim were valuable products that could be sold for value.

47. For example, internal memoranda and external communications by NCR and the Appleton facility referred to NCR Paper broke as a "waste" material and the Appleton facility employees were directed to dispose of broke through the most economical means.

**ANSWER:** NCR denies the allegations set forth in Paragraph 47, and states that CCP broke and trim were valuable products that were sold for value by the Appleton facility.

48. Similarly, in 1952, NCR and Mead concluded that broke and trim from Mead's coating operations would be "about 10%."

**ANSWER:** NCR denies the allegations set forth in Paragraph 48.

49. With respect to converting, NCR representatives expected that approximately 20 to 25 percent of the PCB-containing sheets and rolls sent to converting plants ended up as unusable wastepaper.

**ANSWER:** NCR denies the allegations set forth in Paragraph 49.

50. NCR knew that its contract coaters and converter customers would need to dispose of the CCP scrap generated from these processes.

**ANSWER:** NCR denies the allegations set forth in Paragraph 50.

**E.   The Recycling of PCB-Laden CCP Waste**

51. The PCB-laden broke and trim created by NCR's converting activities, and by NCR's contract coaters (including by its subsidiaries ACPC and Combined Locks, as well as by Mead), was waste. This waste was sold either directly, or through third-party waste paper brokers, to paper companies for recycling.

**ANSWER:** NCR denies the allegations set forth in Paragraph 51, except states that CCP broke and trim were valuable products that were sold for value to paper brokers. NCR specifically denies that NCR or its predecessors sold CCP broke or trim to paper mills or any other facilities located at or near the Kalamazoo Site.

15

52.     The practice of selling CCP broke and trim for recycling was well known to NCR, was well known within the industry generally, and was widespread. Approximately 80 to 98 percent of waste paper resulting from coating and converting CCP was recycled within the paper industry.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 52, except admits that

CCP broke and trim were valuable products that could be sold for value to paper brokers.

53.     NCR placed the CCP product into the stream of commerce while knowing and intending that, as a result of the coating and converting process conducted by its converters and contract coaters, broke and trim scraps would be created and would then be sold as waste to recyclers.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 53.

54.     Recyclers acquired NCR CCP broke and trim in order to recover the wood fibers from the product and reuse them in other paper products. NCR knew that CCP broke and trim were being recycled for the fiber within the NCR paper — not for the CCP itself, the coating, or the PCBs in the coating. The PCBs contained in the NCR Paper broke were of no use to those paper mills.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 54.

55.     Based in part on their own experiments and experience, NCR knew that re-pulping processes would rupture the capsules coated on CCP broke, releasing the PCBs and the dye. NCR also knew that the dye would discolor the pulp and that the discoloration typically would need to be reduced by deinking or washing processes. NCR knew that mills that recycled NCR CCP broke actually employed such processes to remove unwanted coatings from the broke.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 55.

56.     The vast majority of the releases of Aroclor 1242 into the Kalamazoo River Superfund Site occurred between at least 1954 (possibly earlier) and 1971, while NCR CCP containing these PCBs was in mass-market production, and thus while PCB-contaminated broke and trim were being generated.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 56.

57.     When they sold CCP broke and trim, NCR, its predecessors, and its affiliated companies (including subsidiary and third-party contract coaters) intended to dispose of waste containing hazardous substances within the meaning of CERCLA.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 57.

### F. NCR Concealed Risks Associated with PCB-Contaminated Paper, and Had Contemporaneous Knowledge of the Dangers of PCB Pollution in the Kalamazoo and Other Rivers

58.     At least as early as 1965, scientists at NCR were aware of the toxicity of PCB Aroclor 1242. NCR records indicate that at least as early as that year, NCR was searching for a replacement to PCB Aroclor 1242.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 58, except admits that in

or around the mid-1960s, NCR was aware that PCBs could be toxic in high doses, and that at

various times NCR was engaged in efforts to improve the performance of CCP, which included

evaluating alternative components for use in CCP.

59.     In or about 1969, Monsanto representatives informed NCR employees about continued environmental problems from the use of PCB Aroclor 1242, and about Monsanto's impending decision to end sales of PCB Aroclor 1242 for NCR paper applications.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 59.

60.     NCR decided to move forward and accelerate production of PCB-containing NCR CCP in 1969 and 1970, despite having frequent meetings about PCBs and despite having increasing knowledge of the environmental risks of PCBs.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 60.

61.     In June 1970, Monsanto informed its customers, including NCR, that it was ceasing the sale of PCB Aroclor 1242 effective August 30, 1970, because of the continuing environmental concerns posed by Aroclor 1242.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 61, except admits that in

or about 1970, Monsanto informed NCR by letter of Monsanto's tentative decision to end sales

of Aroclor 1242.

62.     After Monsanto wrote its customers in early 1970, explaining why it was discontinuing production of PCB Aroclor 1242, NCR *continued* producing carbonless paper for another year at a rapid pace using Aroclor 1242. At the same time, NCR continued to dispose of its PCB-containing broke and trim (whether directly or through its various subsidiaries and contract coaters) by shipping this waste to paper recycling companies, including those located near the Kalamazoo River Superfund Site, for de-inking and recycling.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 62, and states that NCR diligently searched for a replacement agent for Aroclor 1242 after receiving notice from Monsanto. NCR further states that by April 1971, Aroclor 1242 was no longer used in the production of CCP. NCR specifically denies that NCR or its predecessors sold CCP broke or trim to paper recycling companies or any other facilities located at or near the Kalamazoo Site.

63.     Before 1971, NCR never warned paper companies that its CCP contained PCBs, much less that the release of PCBs into the environment could cause harm.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 63, except admits that prior to 1971, NCR did not broadly communicate with paper recycling companies concerning the components of CCP, and states that the fact that CCP contained PCBs was publicly available information. NCR further states that prior to 1972, NCR could not reasonably have known or expected that the use of Aroclor 1242 in CCP would result in environmental harm.

64.     By April 1971, NCR phased out its use of PCBs in the production of NCR paper.

**ANSWER:**     NCR admits that by April 1971, the emulsion that was used by paper coating companies in the production of CCP no longer contained Aroclor 1242. NCR denies any remaining allegations in Paragraph 64.

65.     Georgia-Pacific was not aware that NCR CCP wastepaper contained PCBs during the production period of 1954 to 1971, or that PCBs could cause environmental damage.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 65.

18

66.     A large percentage of the releases of PCBs to the Kalamazoo River and the Site occurred when NCR (and its subsidiaries) knew that there was a significant risk of environmental damage resulting from the recycling and deinking of waste NCR broke and trim.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 66.

67.     NCR elected to follow a risk-management strategy that accepted the concealed risk of potential environmental harm in exchange for the financial benefits of continued (and indeed increasing) sales of carbonless paper containing PCB Aroclor 1242.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 67.

68.     Between parties that produced the product, like NCR, and those that, like Georgia-Pacific, merely processed it and recycled it, the producers bear principal responsibility for any resulting environmental damage.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 68.

**G.     PCB-Contaminated Paper from NCR's CCP Is the Principal Source of the Present-Day Contamination in the Kalamazoo River**

69.     EPA has determined that the PCB contamination at the Kalamazoo River Superfund Site primarily was caused by discharges of PCBs from the recycling and/or de-inking paper-manufacturing process of paper mills on Portage Creek, the Kalamazoo River, and other areas within the Kalamazoo River Superfund Site.  Specifically, the PCB-contamination of the Kalamazoo River Superfund Site is a direct result of paper companies, including Georgia-Pacific and others, de-inking and/or recycling PCB-containing broke and trim waste from at least 1954 through and including 1971 that was shipped and/or arranged to be shipped by NCR, its subsidiaries and its various contract coaters.

**ANSWER:**     NCR states that it is without knowledge or information sufficient to form a

belief regarding the truth of the allegations set forth in the first sentence of Paragraph 69, except

admits that GP and certain other PRPs unrelated to NCR have been found to be responsible for

the discharge, release and/or disposal of PCBs at the Kalamazoo Site.  NCR denies the

allegations set forth in the second sentence of Paragraph 69.  NCR specifically denies that NCR

or its predecessors sold CCP broke or trim to paper mills or any other facilities located at or near

the Kalamazoo Site.

19

70. EPA's cleanup requirements at the Kalamazoo River Superfund Site are being driven by the presence of PCB Aroclor 1242, which has been found in sediment, soil, fish, and water samples in Portage Creek, in the Kalamazoo River, and in landfills and other locations that are part of the Kalamazoo River Superfund Site. PCB Aroclor 1242 is the type of PCB used by NCR in the manufacture of NCR paper from at least 1954 to 1971.

**ANSWER:** NCR states that it is without knowledge or information sufficient to form a belief regarding the truth of the allegations set forth in the first sentence of Paragraph 70. NCR denies the allegations set forth in the second sentence of Paragraph 70, except admits that at certain times between 1954 to April 1971, Aroclor 1242 was used as a component in the production of CCP.

## IV. NCR's Liability

### A. NCR is a Corporate Successor to the Arranger Liability of ACPC and Combined Locks

71. ACPC and the Combined Locks Mill sold substantial quantities of PCB-containing waste to brokers and dealers which, in turn, delivered this waste to various recycling and/or de-inking locations — including Allied Paper Company's Bryant Mill and other paper mills on the Kalamazoo River.

**ANSWER:** NCR denies the allegations set forth in Paragraph 72, except admits that production of CCP by ACPC and the Combined Locks Mill resulted in the creation of valuable products known as "broke" and "trim" that were sold for value to paper brokers. NCR specifically denies that NCR or its predecessors sold CCP broke or trim to paper mills or any other facilities located at or near the Kalamazoo Site.

72. When they sold their PCB-laden broke and trim to brokers, ACPC and the Combined Locks Mill knew, or reasonably should have known, that the waste would be sold to recyclers and/or de-inkers such as the paper mills on the Kalamazoo River.

**ANSWER:** NCR denies the allegations set forth in Paragraph 72.

73. ACPC and the Combined Locks Mill knew, or should have known, that the reprocessing of waste from the coating process would result in the discharge of wastewater and the disposal of other waste containing PCBs.

**ANSWER:** NCR denies the allegations set forth in Paragraph 73.

20

74.     Effective July 29, 1969, NCR acquired 100 percent of the outstanding common stock of Combined Paper Mills, Inc.  On September 30, 1970, NCR acquired 100 percent of the outstanding common stock of ACPC.  Shortly thereafter, NCR consolidated ACPC and Combined Paper Mills, Inc. into Appleton Papers, Inc. a wholly owned subsidiary of NCR. Ultimately, Appleton Papers, Inc. was merged into NCR.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 74, except admits that:

(i) NCR acquired Combined Paper in or about 1969; (ii) NCR acquired ACPC in or about 1970;

(iii) NCR merged Combined Paper and ACPC into a single entity named Appleton Papers, Inc.

("Appleton Papers") in or about 1971; (iv) in or about 1973, Appleton Papers was merged into

NCR, and became an operating division known as Appleton Papers Division; and (v)  API

acquired the Appleton Papers Division from NCR in 1978.

75.     NCR is the corporate successor to the resulting liability of ACPC and Combined Locks.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 75, except admits that it

is a corporate successor to ACPC and Combined Paper.

### B.     NCR Also is Liable as an Arranger in Connection with Mead's Activities

76.     As set forth above, Mead acted as NCR's contract coater for the purpose of coating CCP.  NCR consigned the PCB-laden emulsion to Mead; NCR set and enforced specifications for the bulk coated product created by Mead; and the bulk coated product created by Mead was either returned to NCR for NCR's own use, or was shipped to NCR's customers for NCR's account.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 76, except admits that at

certain times Mead Corporation produced CCP at its Chillicothe, Ohio plant by coating base

paper with an emulsion that it purchased from NCR and subsequently sold certain amounts of

CCP to NCR that conformed to NCR's requested specifications.

Case 1:10-cv-01087-WCG   Filed 02/08/11   Page 21 of 45   Document 29

77.    NCR also set minimum quality standards for Mead's operations.  Upon information and belief, NCR would not accept bulk coated product that did not meet the minimum quality standards set by NCR, and required disposal of such material instead.

**ANSWER:**    NCR denies the allegations set forth in Paragraph 77, except admits that at certain times NCR ordered CCP that conformed to requested specifications.

78.    Substantial quantities of PCB-laden CCP waste from Mead's Ohio facility were sold to brokers and dealers which, in turn, delivered this waste to various recycling and/or de-inking locations - including Allied Paper Company's Bryant Mill and other paper mills on the Kalamazoo River.

**ANSWER:**    NCR states that it is without knowledge or information sufficient to form a belief regarding the truth of the allegations set forth in Paragraph 78, except states that CCP broke and trim were valuable products that could be sold for value.

79.    NCR consigned its emulsion to Mead, directed Mead to engage in the coating of CCP using that emulsion, and directed and controlled the manner in which Mead engaged in that coating.

**ANSWER:**    NCR denies the allegations set forth in Paragraph 79, except admits that at certain times Mead Corporation produced certain amounts of CCP using an emulsion that it purchased from NCR.

80.    In this relationship with Mead, NCR at all times had the understanding, intention, and expectation that Mead would (a) engage in a coating process that created waste, (b) dispose of that waste on behalf of NCR, and (c) send NCR a finished product containing NCR's emulsion - an emulsion that NCR owned at all times during the manufacturing process.

**ANSWER:**    NCR denies the allegations set forth in Paragraph 80.

81.    NCR knew and intended that the waste from Mead's coating operations would be sold to recyclers and/or de-inkers such as the mills on the Kalamazoo River.

**ANSWER:**    NCR denies the allegations set forth in Paragraph 81.

82.    NCR knew and intended that the reprocessing of waste from the coating process performed by Mead would result in the discharge of wastewater and disposal of other waste containing PCBs.

**ANSWER:**    NCR denies the allegations set forth in Paragraph 82.

83.     NCR itself was an arranger, within the meaning of CERCLA, for the waste, containing PCBs, that was disposed of by Mead.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 83.

**C.     NCR's Own Converting Operations Generated, and Made Arrangements for the Disposal of, PCB-Containing Wastes Destined for the Kalamazoo River**

84.     NCR did not own any paper-making facilities during the relevant time period, so it could not have reused or processed the broke and trim resulting from its own converting operations.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 84, except admits that

between 1954 and April 1971, NCR did not own plants that could process broke or trim.

85.     All of the PCB-containing broke and trim generated by NCR's Business Forms and Supply Division was delivered to brokers and dealers that delivered this waste paper to third-party recyclers.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 85, except admits that

broke and trim resulting from NCR's converting operations were sold to paper brokers for value.

86.     NCR knew and intended that its CCP converting waste would be recycled at paper mills situated on rivers such as the Kalamazoo River.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 86.

87.     NCR also knew, or should have known, that the reprocessing of this waste would result in the discharge of wastewater and other waste containing PCBs.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 87.

88.     On information and belief, substantial amounts of PCB-containing waste paper from NCR's Business Forms and Supply Division were sold to recycling facilities on the Kalamazoo River, with the result that PCBs from that waste paper were released into the Kalamazoo River and the Kalamazoo River Superfund Site.

**ANSWER:**     NCR denies the allegations set forth in Paragraph 88.

**D.     EPA Issues a General Notice of Potential Liability to NCR in Connection with PCB Contamination of the Kalamazoo River**

89.     On November 24, 2010, EPA gave notice to NCR that "NCR may be liable under Section 107 of CERCLA with respect to the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site as an arranger . . . ." The EPA also gave notice that "EPA has reason to believe

23

that NCR arranged for the transportation and disposal of paper material containing PCBs to the Site." A copy of this notice is attached as Exhibit A.

**ANSWER:** NCR denies the allegations set forth in Paragraph 89, except admits that on or about November 24, 2010, EPA sent a General Notice Letter to NCR that is attached to the Complaint as Exhibit A, and NCR refers to the General Notice Letter for its contents.

**V.    IP' s Liability**

**A.    The Bryant Mill**

90.    IP is liable under CERCLA for PCB contamination caused by the "Bryant Mill," and by other paper mills, at or near the Kalamazoo River Superfund Site.

**ANSWER:** NCR states that Paragraph 90 asserts allegations against other parties to which no response is required from NCR.

91.    The Bryant Mill consisted of approximately 70 acres, and was located along Portage Creek, three miles upstream from Portage Creek's confluence with the Kalamazoo River.

**ANSWER:** NCR states that Paragraph 91 asserts allegations against other parties to which no response is required from NCR.

92.    The Bryant Mill was purchased by Time, Inc. during World War II.

**ANSWER:** NCR states that Paragraph 92 asserts allegations against other parties to which no response is required from NCR.

93.    St. Regis Paper Company initially operated the Bryant Mill for Time, Inc., then purchased the facility outright in 1946.

**ANSWER:** NCR states that Paragraph 93 asserts allegations against other parties to which no response is required from NCR.

94.    St. Regis continued to operate the facility until 1956.

**ANSWER:** NCR states that Paragraph 94 asserts allegations against other parties to which no response is required from NCR.

24

95.     During the time period between 1954 and 1956, St. Regis de-inked and re-pulped PCB-laden NCR broke and trim at the Bryant Mill, releasing PCBs into Portage Creek and the Kalamazoo River in the process.

**ANSWER:**     NCR states that Paragraph 95 asserts allegations against other parties to which no response is required from NCR.  To the extent that allegations in Paragraph 95 require a response from NCR, NCR denies those allegations.

96.     In 1956, St. Regis leased the land and equipment of the Bryant Mill to the Allied Paper Division of the Thor Corporation ("Allied").

**ANSWER:**     NCR states that Paragraph 96 asserts allegations against other parties to which no response is required from NCR.

97.     Allied, as St. Regis's lessee at the Bryant Mill from 1956 through and including 1966, continued to discharge PCBs to Portage Creek and the Kalamazoo River as a direct result of its de-inking and recycling of NCR broke and trim.

**ANSWER:**     NCR states that Paragraph 97 asserts allegations against other parties to which no response is required from NCR.  To the extent that allegations in Paragraph 97 require a response from NCR, NCR denies those allegations.

98.     Allied's releases of paper waste to Portage Creek and the Kalamazoo River during the lease period frequently were conducted by exceeding permit limits and regulatory requirements.  For example, in one inspection during the lease period, the Michigan Water Resources Commission noted that the waste treatment systems at the Bryant Mill and King Mill were inoperational or were being bypassed.

**ANSWER:**     NCR states that Paragraph 98 asserts allegations against other parties to which no response is required from NCR.

99.     According to the MDEQ's May 30, 2000, "Preassessment Screen (Kalamazoo River Environment Site)," Allied claims to have released 70,760 kilograms (156,000 pounds) of paper waste per day to Portage Creek and the Kalamazoo River in 1961.  The MDEQ concluded that because dewatered residuals produced during this same time period typically contained elevated concentrations of PCBs, this raw paper waste discharged from the Bryant Mill also contained elevated PCB concentrations.

**ANSWER:**     NCR states that Paragraph 99 asserts allegations against other parties to which no response is required from NCR.

100.    Allied purchased the Bryant Mill from St. Regis in 1966.

**ANSWER:**    NCR states that Paragraph 100 asserts allegations against other parties to which no response is required from NCR.

101.    In 1984, St. Regis was acquired by Champion International Corporation. St. Regis was merged into Champion in 1985.  Champion became the legal successor to St. Regis's liabilities.

**ANSWER:**    NCR states that Paragraph 101 asserts allegations against other parties to which no response is required from NCR.

102.    In June 2000, IP acquired Champion.  On December 31, 2000, Champion was merged into IP, and IP assumed Champion liabilities including liability for St. Regis.

**ANSWER:**    NCR states that Paragraph 102 asserts allegations against other parties to which no response is required from NCR.

103.    IP is, therefore, a corporate successor to the owner and operator of the Bryant Mill during the period from 1954 to 1956.  IP also is a corporate successor to the owner and lessor of the Bryant Mill during the period from 1956 to 1966.

**ANSWER:**    NCR states that Paragraph 103 asserts allegations against other parties to which no response is required from NCR.

104.    IP's successor liability for the activities of St. Regis as a result of these acquisitions already has been established at numerous Superfund sites throughout the United States.

**ANSWER:**    NCR states that Paragraph 104 asserts allegations against other parties to which no response is required from NCR.

105.    Since 2000, EPA and state environmental protection agencies have determined that IP is a responsible party at other Federal and State Superfund sites as a result of the historic operations of both St. Regis and Champion.  These sites include the San Jacinto River Waste Pits Superfund Site in Harris County, Texas; the Libby, Montana, Groundwater Superfund Site; the Cass Lake, Minnesota, Superfund Site, also known as the "St. Regis" Superfund Site; the Klickitat Valley Sawmill Superfund Site in Washington State; and the West Site/Hows Corner Superfund Site in Plymouth, Maine.

ANSWER:    NCR states that Paragraph 105 asserts allegations against other parties to

which no response is required from NCR.

106.    In addition, on October 28, 2009, in litigation related to the "Friction Division Products Site" in New Jersey, IP admitted that it had previously assumed, and currently bears, "potential liability arising from the former operations of St. Regis."

ANSWER:    NCR states that Paragraph 106 asserts allegations against other parties to

which no response is required from NCR.

**B.    EPA Issues a General Notice of Potential Liability to IP in Connection with PCB Contamination of the Kalamazoo River**

107.    On November 24, 2010, EPA gave notice to IP that IP "may be liable under Section 107 of CERCLA with respect to the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site as a past owner and/or operator of a portion of the Site at the time PCBs were released into the environment." The EPA also gave notice that "EPA has reason to believe that International Paper is a corporate successor to St. Regis Paper Company and Bryant Paper Company, which were owners and operators of paper mills that disposed of PCBs and PCB-containing material at the Site." A copy of this notice is attached as Exhibit B.

ANSWER:    NCR states that Paragraph 107 asserts allegations against other parties to

which no response is required from NCR.

FIRST CAUSE OF ACTION

**Claim for Contribution Against NCR Pursuant to CERCLA Section 113**

108.    Georgia-Pacific realleges and incorporates the preceding paragraphs as if fully set forth herein.

ANSWER:    NCR incorporates by reference its answers to Paragraphs 1-107.

27

109.     CERCLA section 113(f), 42 U.S.C. § 9613(f), authorizes any person to seek contribution from any other person who is liable or potentially liable under the standards set forth in CERCLA section 107(a), 42 U.S.C. § 9607(a).

**ANSWER:**     NCR states that Paragraph 109 asserts legal conclusions to which no response is required.

110.     The Kalamazoo River Superfund Site is a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

**ANSWER:**     NCR admits the allegations set forth in Paragraph 110.

111.     Georgia-Pacific is a "person" as defined by CERCLA section 101(21), 42 U. S.C. § 9601(21).

**ANSWER:**     NCR admits the allegations set forth in Paragraph 111.

112.     NCR itself, and in its capacity as a corporate successor, is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

**ANSWER:**     NCR admits the allegations set forth in Paragraph 112.

113.     There was an actual or threatened "release" at the Kalamazoo River Superfund Site of "hazardous substances" within the meaning of CERCLA sections 101(4) and (22), 44 U.S.C. §§ 9601(14), (22).

**ANSWER:**     NCR states that it is without knowledge or information sufficient to form a belief regarding the truth of the allegations set forth in Paragraph 113, except admits that GP and certain other PRPs unrelated to NCR have been found to be responsible for the discharge, release and/or disposal of hazardous substances at the Kalamazoo Site.

114.     NCR is a person that by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances, in the form of PCB-containing NCR paper broke and trim, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

**ANSWER:**     NCR denies the allegations set forth in Paragraph 114.

28

115.    In connection with the releases of PCBs from the facilities located near the Kalamazoo River, Georgia-Pacific has incurred and will incur "response costs" within the meaning of CERCLA section 101(25a), 42 U.S.C. § 9601(25).  These "response costs" were, and will be, necessary and consistent with the National Contingency Plan pursuant to CERCLA section 105(a), 42 U.S.C. § 9605(a).

**ANSWER:**    NCR states that it is without knowledge or information sufficient to form a

belief regarding the truth of the allegations set forth in Paragraph 115.

116.    Georgia-Pacific has made direct payments, and has reimbursed payments made by the United States and the State of Michigan, in amounts greater than Georgia-Pacific's equitable share of Kalamazoo River Superfund Site response costs.  Georgia-Pacific also has made other payments and/or incurred costs related to its in-kind services for the investigation and remediation of the Kalamazoo River that are greater than Georgia-Pacific's equitable share of those costs.

**ANSWER:**    NCR states that it is without knowledge or information sufficient to form a

belief regarding the truth of the allegations set forth in Paragraph 116.

117.    This Court can and should allocate response costs among liable parties using such equitable factors as the Court deems appropriate pursuant to CERCLA section 113(f)(1), 42 U.S.C. § 9613(f)(1).  Among the equitable factors that the court should consider in allocating response costs are the following:

**ANSWER:**    NCR denies the allegations set forth in the introductory section of

Paragraph 117, and specifically denies that GP is entitled to the relief requested.

a.    Georgia-Pacific has cooperated with State and Federal authorities to

investigate and remediate the Kalamazoo River Superfund Site;

**ANSWER:**    NCR states that it is without knowledge or information sufficient to form a

belief regarding the truth of the allegations set forth in Paragraph 117(a).

b.    Georgia-Pacific has paid in excess of $79 million as of the date of this

Complaint, and is required to spend a significant amount of money in the future to investigate

and remediate the site;

**ANSWER:**    NCR states that it is without knowledge or information sufficient to form a

belief regarding the truth of the allegations set forth in Paragraph 117(b).

29

c.      NCR developed the PCB-contaminated paper that is the source of the Kalamazoo River Superfund Site conditions that require remediation;

**ANSWER:**    NCR denies the allegations set forth in Paragraph 117(c).

d.      NCR, through its subsidiaries and/or its contract coaters, including ACPC, the Combined Locks Mill, and Mead, and through the operations of its Business Forms and Supply Division, made arrangements to deliver its PCB-laden paper waste to paper recyclers, knowing that the PCBs in the paper likely would be released by paper recycling operations into river systems like the Kalamazoo River;

**ANSWER:**    NCR denies the allegations set forth in Paragraph 117(d).

e.      NCR also is liable as the successor to ACPC and the Combined Locks processing operations;

**ANSWER:**    NCR denies the allegations set forth in Paragraph 117(e).

f.      NCR concealed the risks of PCB-laden paper waste from Georgia-Pacific and other mill operators on the Kalamazoo River;

**ANSWER:**    NCR denies the allegations set forth in Paragraph 117(f).

g.      Relative to NCR, Georgia-Pacific was an innocent discharger of wastes later found to contain PCBs; and

**ANSWER:**    NCR denies the allegations set forth in Paragraph 117(g).

h.      NCR has not paid its equitable share of response costs at the Kalamazoo River Superfund Site.

**ANSWER:**    NCR denies the allegations set forth in Paragraph 117(h).

118.    NCR is liable to Georgia-Pacific for response costs paid by Georgia-Pacific that are in excess of Georgia-Pacific's equitable share and that are, as a matter of equity, attributable to NCR.

**ANSWER:**    NCR denies the allegations set forth in Paragraph 118.

30

119. Pursuant to the standards of section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and in accordance with section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Georgia-Pacific is entitled to recover interest on the Kalamazoo River Superfund Site response costs it has paid and will pay in the future in excess of its equitable share.

**ANSWER:** NCR denies the allegations set forth in Paragraph 119.

<u>SECOND CAUSE OF ACTION</u>

**Claim for Response Costs Against NCR Pursuant to CERCLA Section 107**

120. Georgia-Pacific realleges and incorporates the preceding paragraphs as if fully set forth herein.

**ANSWER:** NCR incorporates by reference its answers to Paragraphs 1-119.

121. CERCLA section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), authorizes the recovery of "necessary costs of response consistent with the national contingency plan."

**ANSWER:** NCR states that Paragraph 121 asserts legal conclusions to which no

response is required.

122. The Kalamazoo River Superfund Site is a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

**ANSWER:** NCR admits the allegations set forth in Paragraph 122.

123. Georgia-Pacific is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

**ANSWER:** NCR admits the allegations set forth in Paragraph 123.

124. NCR itself, and in its capacity as a corporate successor, is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

**ANSWER:** NCR admits the allegations set forth in Paragraph 124.

125. There was an actual or threatened "release" at the Kalamazoo River Superfund Site of "hazardous substances" within the meaning of CERCLA sections 101(4) and (22), 44 U.S.C. §§ 9601(14), (22).

**ANSWER:** NCR states that it is without knowledge or information sufficient to form a

belief regarding the truth of the allegations set forth in Paragraph 125, except admits that GP and

31

certain other PRPs unrelated to NCR have been found to be responsible for the discharge, release and/or disposal of hazardous substances at the Kalamazoo Site.

126. NCR is a person that by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances, in the form of PCB-containing NCR paper broke and trim, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

**ANSWER:** NCR denies the allegations set forth in Paragraph 126.

127. In connection with the releases of PCBs from the facilities located near the Kalamazoo River, Georgia-Pacific has incurred and will incur "response costs" within the meaning of CERCLA section 101(25a), 42 U.S.C. § 9601(25). These "response costs" were, and will be, necessary and consistent with the National Contingency Plan pursuant to CERCLA section 105(a), 42 U.S.C. § 9605(a).

**ANSWER:** NCR states that it is without knowledge or information sufficient to form a belief regarding the truth of the allegations set forth in Paragraph 127.

128. Georgia-Pacific has made direct payments, and has reimbursed payments made by the United States and the State of Michigan, in amounts greater than Georgia-Pacific's equitable share of Kalamazoo River Superfund Site response costs. Georgia-Pacific also has made other payments and incurred costs related to its in-kind services for the investigation and remediation of the Kalamazoo River that are greater than Georgia-Pacific's equitable share of those costs.

**ANSWER:** NCR states that it is without knowledge or information sufficient to form a belief regarding the truth of the allegations set forth in Paragraph 128.

129. Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), provides a cause of action for private parties that may be used either as an alternative, or an additional, legal ground for reimbursement of some or all of the types of costs that have been, and will be, incurred by Georgia-Pacific.

**ANSWER:** NCR states that Paragraph 129 asserts legal conclusions to which no response is required.

130. Insofar as any costs sought by Georgia-Pacific are not recoverable pursuant to a contribution claim under section 113(f)(1) of CERCLA, 42 U.S.C. 9613(f)(1), those costs are recoverable under section 107(a)(4)(B).

**ANSWER:** NCR denies the allegations set forth in Paragraph 130.

131. Insofar as equitable factors are applicable to resolving a claim under section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), when considering the amount and share of costs that should be recovered from NCR, the Court should consider the following:

**ANSWER:** NCR denies the allegations set forth in the introductory section of Paragraph 131, and specifically denies that GP is entitled to the relief requested.

a. Georgia-Pacific has cooperated with State and Federal authorities to investigate and remediate the Kalamazoo River Superfund Site;

**ANSWER:** NCR is without knowledge or information sufficient to form a belief regarding the truth of the allegations set forth in Paragraph 131(a).

b. Georgia-Pacific has paid in excess of $79 million as of the date of this Complaint, and is required to spend a significant amount of money in the future to investigate and remediate the site;

**ANSWER:** NCR is without knowledge or information sufficient to form a belief regarding the truth of the allegations set forth in Paragraph 131(b).

c. NCR developed the PCB-contaminated paper that is the source of the Kalamazoo River Superfund Site conditions that require remediation;

**ANSWER:** NCR denies the allegations set forth in Paragraph 131(c).

d. NCR, through its subsidiaries and/or its contract coaters, including ACPC, the Combined Locks Mill, and Mead, and through the operations of its Business Forms and Supply Division, made arrangements to deliver its PCB-laden paper waste to paper recyclers, knowing that the PCBs in the paper likely would be released by paper recycling operations into river systems like the Kalamazoo River;

**ANSWER:** NCR denies the allegations set forth in Paragraph 131(d).

e. NCR also is liable as the successor to ACPC and the Combined Locks processing operations;

33

**ANSWER:** NCR denies the allegations set forth in Paragraph 131(e).

f. NCR concealed the risks of PCB-laden paper waste from Georgia-Pacific and other mill operators on the Kalamazoo River;

**ANSWER:** NCR denies the allegations set forth in Paragraph 131(f).

g. Relative to NCR, Georgia-Pacific was an innocent discharger of wastes later found to contain PCBs; and

**ANSWER:** NCR denies the allegations set forth in Paragraph 131(g).

h. NCR has not paid its equitable share of response costs at the Kalamazoo River Superfund Site.

**ANSWER:** NCR denies the allegations set forth in Paragraph 131(h).

132. NCR is liable, pursuant to section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), to Georgia-Pacific for past and future Kalamazoo River Superfund Site response costs that are in excess of Georgia-Pacific's equitable share of those costs.

**ANSWER:** NCR denies the allegations set forth in Paragraph 132.

133. In accordance with section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Georgia-Pacific is entitled to recover interest on the Kalamazoo River Superfund site response costs it has paid and will pay in the future in excess of its equitable share of those costs.

**ANSWER:** NCR denies the allegations set forth in Paragraph 133.

<u>THIRD CAUSE OF ACTION</u>

**Claim for Contribution Against IP Pursuant to CERCLA Section 113**

134. Georgia-Pacific realleges and incorporates the preceding paragraphs as if fully set forth herein.

**ANSWER:** NCR incorporates by reference its answers to Paragraphs 1-133.

34

135.    CERCLA section 113(f), 42 U.S.C. § 9613(f), authorizes any person to seek contribution from any other person who is liable or potentially liable under CERCLA section 107(a), 42 U.S.C. § 9607(a).

**ANSWER:**    NCR states that Paragraph 135 asserts allegations against other parties to which no response is required from NCR.

136.    The Kalamazoo River Superfund Site is a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

**ANSWER:**    NCR states that Paragraph 136 asserts allegations against other parties to which no response is required from NCR.

137.    Georgia-Pacific is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

**ANSWER:**    NCR states that Paragraph 137 asserts allegations against other parties to which no response is required from NCR.

138.    IP is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

**ANSWER:**    NCR states that Paragraph 138 asserts allegations against other parties to which no response is required from NCR.

139.    There was an actual or threatened "release" at the Kalamazoo River Superfund Site of "hazardous substances" within the meaning of CERCLA sections 101(4) and (22), 44 U.S.C. §§ 9601(14), (22).

**ANSWER:**    NCR states that Paragraph 139 asserts allegations against other parties to which no response is required from NCR.

140.    IP is a person that owned and operated facilities at the time of the disposal of hazardous substances within the meaning of CERCLA section 107(a)(2), 42 U.S.C. § 9607(a)(2).

**ANSWER:**    NCR states that Paragraph 140 asserts allegations against other parties to which no response is required from NCR.

141.    In connection with the releases of PCBs from the facilities located near the Kalamazoo River and into the Kalamazoo River Superfund Site, Georgia-Pacific has incurred and will incur "response costs" within the meaning of CERCLA section 101(25a), 42 U.S.C.

§ 9601(25), and such "response costs" were and will be necessary and consistent with the National Contingency Plan pursuant to CERCLA section 105(a), 42 U.S.C. § 9605(a).

**ANSWER:** NCR states that Paragraph 141 asserts allegations against other parties to which no response is required from NCR.

142. Georgia-Pacific has reimbursed the United States and the State of Michigan for amounts greater than its equitable share of Kalamazoo River Superfund Site response costs. Georgia-Pacific has also made other payments and/or incurred costs related to its in-kind services for the investigation and remediation of the Kalamazoo River Superfund Site that are greater than Georgia-Pacific's equitable share of those costs.

**ANSWER:** NCR states that Paragraph 142 asserts allegations against other parties to which no response is required from NCR.

143. This Court can and should allocate response costs among liable parties using such equitable factors as the Court deems appropriate pursuant to CERCLA section 113(f)(1), 42 U.S.C. § 9613(f)(1). Among the equitable factors that the Court should consider in allocating response costs are the following:

**ANSWER:** NCR states that the introductory section of Paragraph 143 asserts allegations against other parties to which no response is required from NCR.

a. Georgia-Pacific has cooperated with State and Federal authorities to investigate and remediate the Kalamazoo River;

**ANSWER:** NCR states that Paragraph 143(a) asserts allegations against other parties to which no response is required from NCR.

b. IP, as a matter of law, as successor to St. Regis, and under the equitable standards of section 113(f)(1) of CERCLA, bears responsibility for discharges of PCBs into the Kalamazoo River by the Bryant Mill;

**ANSWER:** NCR states that Paragraph 143(b) asserts allegations against other parties to which no response is required from NCR.

c. The Bryant Mill was a significant contributor of PCBs to the Kalamazoo River;

36

**ANSWER:**     NCR states that Paragraph 143(c) asserts allegations against other parties to which no response is required from NCR.

d.     The Bryant Mill violated applicable permits and regulatory requirements;

**ANSWER:**     NCR states that Paragraph 143(d) asserts allegations against other parties to which no response is required from NCR.

e.     Some of the pollution by the Bryant Mill occurred while St. Regis was able and obliged, as a knowledgeable owner and lessor, to monitor and prevent those environmentally damaging activities;

**ANSWER:**     NCR states that Paragraph 143(e) asserts allegations against other parties to which no response is required from NCR.

f.     The contribution of IP to the contamination, and to the conditions requiring remediation, of the Kalamazoo River is greater than that of Georgia-Pacific; and

**ANSWER:**     NCR states that Paragraph 143(f) asserts allegations against other parties to which no response is required from NCR.

g.     IP has not paid its equitable share of the response costs that have been incurred at the Kalamazoo River Superfund Site.

**ANSWER:**     NCR states that Paragraph 143(g) asserts allegations against other parties to which no response is required from NCR.

144.     IP is liable to Georgia-Pacific for costs paid by Georgia-Pacific that are in excess of Georgia-Pacific's equitable share and that are, as a matter of equity, attributable to IP.

**ANSWER:**     NCR states that Paragraph 144 asserts allegations against other parties to which no response is required from NCR.

145. Pursuant to the standards of section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and in accordance with section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Georgia-Pacific is entitled to recover interest on the Kalamazoo River Superfund Site costs it has paid and will pay in the future in excess of its equitable share.

**ANSWER:** NCR states that Paragraph 145 asserts allegations against other parties to which no response is required from NCR.

## FOURTH CAUSE OF ACTION

### Claim for Response Costs Against IP Pursuant to CERCLA Section 107

146. Georgia-Pacific realleges and incorporates the preceding paragraphs as if fully set forth herein.

**ANSWER:** NCR incorporates by reference its answers to Paragraphs 1-145.

147. CERCLA section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), authorizes the recovery of "necessary costs of response consistent with the national contingency plan."

**ANSWER:** NCR states that Paragraph 147 asserts allegations against other parties to which no response is required from NCR.

148. The Kalamazoo River Superfund Site is a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

**ANSWER:** NCR states that Paragraph 148 asserts allegations against other parties to which no response is required from NCR.

149. Georgia-Pacific is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

**ANSWER:** NCR states that Paragraph 149 asserts allegations against other parties to which no response is required from NCR.

150. IP itself, and in its capacity as a corporate successor, is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

**ANSWER:** NCR states that Paragraph 150 asserts allegations against other parties to which no response is required from NCR.

151.    There was an actual or threatened "release" at the Kalamazoo River Superfund Site of "hazardous substances" within the meaning of CERCLA sections 101(4) and (22), 44 U.S.C. §§ 9601(14), (22).

**ANSWER:**    NCR states that Paragraph 151 asserts allegations against other parties to which no response is required from NCR.

152.    IP is a person that by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances, in the form of PCB-containing NCR paper broke and trim, within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

**ANSWER:**    NCR states that Paragraph 152 asserts allegations against other parties to which no response is required from NCR. To the extent that allegations in Paragraph 152 require a response from NCR, NCR denies those allegations.

153.    In connection with the releases of PCBs from the facilities located near the Kalamazoo River, Georgia-Pacific has incurred and will incur "response costs" within the meaning of CERCLA section 101(25a), 42 U.S.C. § 9601(25). These "response costs" were, and will be, necessary and consistent with the National Contingency Plan pursuant to CERCLA section 105(a), 42 U.S.C. § 9605(a).

**ANSWER:**    NCR states that Paragraph 153 asserts allegations against other parties to which no response is required from NCR.

154.    Georgia-Pacific has made direct payments, and has reimbursed payments made by the United States and the State of Michigan, in amounts greater than Georgia-Pacific's equitable share of Kalamazoo River Superfund Site response costs. Georgia-Pacific also has made other payments and incurred costs related to its in-kind services for the investigation and remediation of the Kalamazoo River that are greater than Georgia-Pacific's equitable share of those costs.

**ANSWER:**    NCR states that Paragraph 154 asserts allegations against other parties to which no response is required from NCR.

155.    Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), provides a cause of action for private parties that may be used either as an alternative, or an additional, legal ground for reimbursement of some or all of the types of costs that have been, and will be, incurred by Georgia-Pacific.

**ANSWER:**    NCR states that Paragraph 155 asserts allegations against other parties to which no response is required from NCR.

156.    Insofar as any costs sought by Georgia-Pacific are not recoverable pursuant to a contribution claim under section 113(f)(1) of CERCLA, 42, U.S.C. 9613(f)(1), those costs are recoverable under section 107(a)(4)(B).

**ANSWER:**    NCR states that Paragraph 156 asserts allegations against other parties to which no response is required from NCR.

157.    Insofar as equitable factors are applicable to resolving a claim under section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), when considering the amount and share of costs that should be recovered from IP, the Court should consider the following:

**ANSWER:**    NCR states that the introductory section of Paragraph 157 asserts allegations against other parties to which no response is required from NCR.

a.    Georgia-Pacific has cooperated with State and Federal authorities to investigate and remediate the Kalamazoo River Superfund Site;

**ANSWER:**    NCR states that Paragraph 157(a) asserts allegations against other parties to which no response is required from NCR.

b.    Georgia-Pacific has paid in excess of $79 million as of the date of this Complaint, and is required to spend a significant amount of money in the future to investigate and remediate the site;

**ANSWER:**    NCR states that Paragraph 157(b) asserts allegations against other parties to which no response is required from NCR.

c.    IP, as a matter of law, as successor to St. Regis, and under the equitable standards of section 113(f)(1) of CERCLA, bears responsibility for discharges of PCBs into the Kalamazoo River by the Bryant Mill;

**ANSWER:**    NCR states that Paragraph 157(c) asserts allegations against other parties to which no response is required from NCR.

d.    The Bryant Mill was a significant contributor of PCBs to the Kalamazoo River;

40

**ANSWER:** NCR states that Paragraph 157(d) asserts allegations against other parties to which no response is required from NCR.

      e.     The Bryant Mill violated applicable permits and regulatory requirements;

**ANSWER:** NCR states that Paragraph 157(e) asserts allegations against other parties to which no response is required from NCR.

      f.     Some of the pollution by the Bryant Mill occurred while St. Regis was able and obliged, as a knowledgeable owner and lessor, to monitor and prevent those environmentally damaging activities;

**ANSWER:** NCR states that Paragraph 157(f) asserts allegations against other parties to which no response is required from NCR.

      g.     The contribution of IP to the contamination, and to the conditions requiring remediation, of the Kalamazoo River is greater than that of Georgia-Pacific; and

**ANSWER:** NCR states that Paragraph 157(g) asserts allegations against other parties to which no response is required from NCR.

      h.     IP has not paid its equitable share of response costs at the Kalamazoo River Superfund Site.

**ANSWER:** NCR states that Paragraph 157(h) asserts allegations against other parties to which no response is required from NCR.

158.    IP is liable, pursuant to section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), to Georgia-Pacific for past and future Kalamazoo River Superfund Site response costs that are in excess of Georgia-Pacific's equitable share of those costs.

**ANSWER:** NCR states that Paragraph 158 asserts allegations against other parties to which no response is required from NCR.

159.    In accordance with section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Georgia-Pacific is entitled to recover interest on the Kalamazoo River Superfund site response costs it has paid and will pay in the future in excess of its equitable share of those costs.

**ANSWER:**    Paragraph 159 asserts allegations against other parties to which no response is required from NCR.

## **GENERAL DENIAL**

160.    With respect to all paragraphs in the Complaint in which GP prays for damages or other relief, NCR denies that GP is so entitled under law.

## **SEPARATE AND AFFIRMATIVE DEFENSES**

1.    NCR hereby incorporates by reference its answers to the allegations set forth in the Complaint filed by Georgia-Pacific Consumer Products LP, Fort James Corporation and Georgia Pacific LLC (collectively, "Plaintiffs" or "GP").

2.    GP's allegations fail to state a claim upon which relief can be granted.

3.    GP's claims are barred in whole or in part because NCR did not arrange for disposal or treatment of any hazardous substances, within the meaning of CERCLA, at the Allied Paper Inc./Portage Creek/Kalamazoo River Superfund Site (the "Kalamazoo Site").

4.    The discharge, release and/or disposal of hazardous substances at the Kalamazoo Site, and any resulting harms, were caused by the acts or omissions of GP and/or other third parties or entities unrelated to NCR, and NCR has no liability for such damages under CERCLA.

5.    The discharge, release and/or disposal of hazardous substances at the Kalamazoo Site, and any resulting harms, were the result of GP's own acts or omissions, over which NCR had no control and continues to have no control.

6.      GP's claims are barred in whole or in part insofar as GP seeks to recover costs that are not reasonable or necessary response costs or are otherwise inconsistent with the National Contingency Plan.

7.      GP's claims are barred in whole or in part to the extent that GP seeks to recover costs and expenses other than response costs, as the term is defined in CERCLA.

8.      GP's claims are barred in whole or in part insofar as GP has failed to meet all conditions precedent to recovery.

9.      GP's claims are barred in whole or in part by the applicable statutes of limitations.

10.     GP's claims are barred in whole or in part by the doctrine of estoppel.

11.     GP's claims, to the extent they are equitable in nature, are barred in whole or in part by the doctrine of laches.

12.     GP's claims, to the extent they are equitable in nature, are barred by the doctrine of unclean hands.

13.     NCR asserts and relies upon any and all defenses available under CERCLA.

14.     NCR reserves its right to assert any and all additional defenses that become known or available during the course of litigation.

## PRAYER FOR RELIEF

WHEREFORE, Defendant NCR respectfully requests that this Court enter judgment as follows:

(1)     Entering judgment in favor of NCR and against GP, dismissing GP's Complaint in its entirety with prejudice; and

(2)     Granting NCR such other relief as the Court deems just, proper or necessary.

43

Dated:  February 8, 2011          Respectfully submitted,


CRAVATH, SWAINE & MOORE LLP,

   by
                    /s/ Evan R. Chesler
                     Evan R. Chesler

          Sandra C. Goldstein
          Darin P. McAtee
             Worldwide Plaza
             825 Eighth Avenue
              New York, NY 10019
               Phone: (212) 474-1000
                Fax: (212) 474-3700
                    echesler@cravath.com

     *Attorneys for NCR Corporation*


     OF COUNSEL:

     SIDLEY AUSTIN LLP
     Kathleen L. Roach
     Evan B. Westerfield
        One South Dearborn Street
           Chicago, Illinois 60603
             Phone: (312) 853-7000
                Fax: (312) 853-7036

     MARTEN LAW PLLC
     Linda R. Larson
     Bradley M. Marten
        1191 Second Avenue, Suite 2200
           Seattle, WA 98101
             Phone: (206) 292-2600
                Fax: (206) 292-2601

44

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 8, 2011, I electronically filed Defendant NCR Corporation's Answer and Affirmative Defenses to the Complaint brought by Georgia-Pacific Consumer Products LP, Fort James Corporation and Georgia Pacific LLC using the ECF system, which will send notification of such filing by operations of the Court's electronic systems. Parties may access this filing via the Court's electronic system.

_____
/s/ Evan R. Chesler
Evan R. Chesler
