IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

GEORGIA-PACIFIC CONSUMER PRODUCTS LP, )
FORT JAMES CORPORATION, and )
GEORGIA-PACIFIC LLC, )
                                       )
              Plaintiffs,              )
                                       )   Civil Action No. 10-C-1087
       v.                              )
                                       )
NCR CORPORATION and                    )
INTERNATIONAL PAPER CO.,               )
                                       )
              Defendants.              )

_____

**DEFENDANT NCR CORPORATION'S REPLY MEMORANDUM IN SUPPORT OF ITS
MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a)**
_____

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ..........................................................................................1

ARGUMENT .........................................................................................................................1

    I.     This Action's Ties to Michigan Predominate Over Wisconsin or Any Other State ................................................................................................................1

          A.    Michigan Is the Only Forum with a Connection to All of the Alleged Activities Relating to NCR's Purported Arranger Liability ...........2

          B.    NCR's Defenses and the Relevant Equitable Factors Involve Issues That Pertain Exclusively to Michigan ...........................................................3

    II.    Relevant Evidence and Witnesses Are Located Predominately in Michigan. .............6

    III.   The Michigan Court Is Best Positioned to Adjudicate the Case Efficiently and Quickly. ..........................................................................................................9

          A.    The Michigan Court Is Already Well-Versed in the Relevant Facts. ...........9

          B.    Adjudication by the Michigan Court Will Mitigate the Risk of Inconsistent Rulings Concerning the Kalamazoo Site. ..............................11

          C.    Transfer Would Best Protect Michigan's Interest in Having a Michigan Case Heard in a Michigan Forum. ............................................12

    IV.   GP Effectively Concedes That Its Choice of Forum Is Not Entitled to Any Weight. ..............................................................................................................12

    V.    IP's Limited Response Should Not Dissuade the Court from Transferring This Action to Its Proper Forum. ..............................................................................13

CONCLUSION ....................................................................................................................14

# TABLE OF AUTHORITIES

**Cases**                                                                                                                          **Page(s)**

Brady v. Hanger Orthopedic Grp., Inc.,
    No. 05 C 0492, 2006 WL 2560953 (N.D. Ill. Aug. 30, 2006)..................................................13

Burlington N. & Santa Fe Ry. Co. v. United States,
    129 S. Ct. 1870 (2009).............................................................................................................3

Century Consultants, Inc. v. Choctaw Racing Servs., LLC,
    No. 05-C-0494, 2005 WL 2671248 (E.D. Wis. Oct. 18, 2005) (Griesbach, J.) ..............7, 8, 13

Envtl. Transp. Sys., Inc. v. ENSCO, Inc.,
    969 F.2d 503 (7th Cir. 1992) ..................................................................................................5

Forcillo v. LeMond Fitness, Inc.,
    220 F.R.D. 550 (S.D. Ill. 2004) ..............................................................................................9

G.J. Leasing Co. v. Union Elec. Co.,
    54 F.3d 379 (7th Cir. 1995) ....................................................................................................3

Kalamazoo River Study Grp. v. Rockwell Int'l Corp.,
    107 F. Supp. 2d 817 (W.D. Mich. 2000) ....................................................................5, 10, 11

Kerr-McGee Chem. Co. v. Lefton Iron & Metal Co.,
    14 F.3d 321 (7th Cir. 1994) ....................................................................................................5

Melendrez v. Briery,
    No. 10-C-271, 2010 WL 2102832 (E.D. Wis. May 21, 2010) ..............................................12

Nat'l Wildlife Fed'n v. Harvey,
    437 F. Supp. 2d 42 (D.D.C. 2006) ........................................................................................12

Regents of the Univ. of Cal. v. Eli Lilly & Co.,
    119 F.3d 1559 (Fed. Cir. 1997)...............................................................................................4

Semiconductor Energy Laboratory Co. v. Samsung Electronics Co.,
    No. 09-cv-1-bbc, 2009 WL 1615528 (W.D. Wis. June 9, 2009)..................................... 10-11

United States v. Burns,
    No. 08-CV-3, 2008 WL 5263743 (N.D. W. Va. Dec. 18, 2008)..............................................4

Ziebell v. Deane,
    No. 08-cv-281-bbc, 2008 WL 3926383 (W.D. Wis. Aug. 21, 2008) .....................................13

**Statutes**

28 U.S.C. § 1404 ................................................................................................................1, 14

42 U.S.C. § 9613(g) ..............................................................................................................3, 4

Defendant NCR Corporation ("NCR"), by and through its undersigned counsel, respectfully submits this reply memorandum in support of its motion, pursuant to 28 U.S.C. § 1404(a), to transfer this action filed by Georgia-Pacific Consumer Products LP, Fort James Corporation and Georgia-Pacific LLC (collectively, "GP"), to the United States District Court for the Western District of Michigan (the "Michigan Court").

## PRELIMINARY STATEMENT

This case is about whether NCR and International Paper ("IP") are liable in connection with alleged releases at a Michigan Site that has been under the supervision of Michigan environmental and judicial authorities for over two decades. GP's claims against NCR involve alleged sales of broke and trim to GP's *Michigan* facilities by 16 facilities located in 12 different states. GP's allegations against IP involve alleged releases by *Michigan* facilities, into a *Michigan* waterway. GP's efforts to justify its forum-shopping by focusing on the few aspects of the case that potentially relate to Wisconsin should not obscure this case's clear Michigan ties. When all the operative facts are considered, the convenience of the parties and the interests of justice militate strongly in favor of transferring this Michigan case to its proper forum: the Western District of Michigan.

## ARGUMENT

### I. **This Action's Ties to Michigan Predominate Over Wisconsin or Any Other State.**

GP maintains that this case focuses on two issues: (1) whether NCR is liable under CERCLA for the PCB contamination at the Kalamazoo Site, and (2) if so, what NCR should pay as its equitable share of the investigation and cleanup costs. (See GP's Opposition to NCR's Motion to Transfer Venue ("GP Br.") at 1.) As a threshold matter, GP's brief ignores the fact that GP *has also filed this case against IP*, and that the case against IP relates *solely* to Michigan. (See Compl. ¶¶ 90-104.) Even setting aside this compelling Michigan connection,

the issues GP identifies relating to NCR's alleged arranger liability also support transfer to the Michigan Court.

      A.    <u>Michigan Is the Only Forum with a Connection to All of the Alleged Activities Relating to NCR's Purported Arranger Liability.</u>

GP attempts to characterize its allegations against NCR as involving the sale of broke and trim solely from Wisconsin facilities. (<u>See</u> GP Br. at 2.) That argument is belied by the very face of the Complaint. GP alleges that NCR is liable as an arranger for the sale of broke and trim from 16 facilities, *13* of which are located outside Wisconsin: the Mead Corporation facility in Chillicothe, Ohio, and 12 NCR paper-converting facilities around the country. (<u>See, e.g.</u>, Compl. ¶¶ 12, 38, 41.) GP alleges that NCR arranged for the disposal of hazardous materials at the Kalamazoo Site from *each* of those 16 facilities. (<u>See</u> Compl. ¶¶ 78, 88.) GP makes no allegation that operations at the three Wisconsin-based facilities resulted in a greater proportion of alleged releases than those at the other facilities, giving Wisconsin a predominant interest in the case.[1] Wisconsin has no greater ties to this litigation than do courts, for example, in Ohio, which is *also* home to three facilities alleged to have sold broke and trim to mills near the Kalamazoo Site. GP's undue emphasis on the Wisconsin location of just three facilities distorts the facts at issue in the case and mischaracterizes the likely scope and sources of discovery.[2]

---

[1] GP also does not allege that the Wisconsin facilities directed practices at the 13 other facilities – nor can it. NCR's headquarters during the relevant time period were located in Dayton, Ohio, and they are currently located in Duluth, Georgia. (<u>See</u> McAtee Decl. ¶3.)

[2] While GP tries to lengthen its short list of ties to Wisconsin by referring to the Portage, Wisconsin facility (GP Br. at 9 & n.11), that facility has no relevance here. The Portage facility was one of several facilities where the emulsion used in the production of carbonless copy paper was manufactured. As GP acknowledges, the Portage facility did not produce broke or trim (GP Br. 9), and it is thus not at issue in this case. GP's discussion of the Portage facility is not only irrelevant but also inaccurate: NCR has never denied that the Portage facility manufactured, at certain times, the emulsion used in the production of CCP. (<u>See</u> GP Br. at 9.) NCR's Answer is entirely consistent with its responses in prior litigation.

2

Whereas the alleged sales of broke and trim potentially involve many different states, *every single alleged purchase* at issue in this case was made by a facility in *Michigan*. The *only* common forum uniting the alleged activities that give rise to NCR's supposed arranger liability is therefore Michigan, where the purported purchases were allegedly made and where the resulting releases of hazardous substances allegedly occurred.[3]

B. <u>NCR's Defenses and the Relevant Equitable Factors Involve Issues That Pertain Exclusively to Michigan.</u>

NCR's defenses to GP's allegations further illustrate the Michigan connections of the case, and demonstrate why transfer to the Michigan Court is appropriate both for the convenience of the parties and to promote judicial efficiency.

1. *Timeliness Defenses.*

First, NCR has raised certain threshold defenses concerning the timeliness of GP's claims that, if successful, will likely resolve all or a significant portion of the case at an early stage of the litigation. (<u>See</u> NCR Answer at 43.) These defenses are based on the tremendous period of time that has passed between when GP was identified as a potentially responsible party ("PRP") at the Kalamazoo Site and when GP decided to bring this lawsuit.

Adjudication of NCR's statute of limitations defense will require an analysis of the decisions entered by the Michigan Court, to determine, among other issues, whether any of the Michigan Court's holdings regarding GP's liability constitute a "judgment . . . for recovery of . . . costs" that triggered the statute of limitations under 42 U.S.C. § 9613(g)(3)(A). There is no

---

[3] Although the time has not yet arrived for discussing the merits of GP's claims concerning arranger liability, NCR vehemently contests the tenuous theory upon which GP's claims are based. Even if broke or trim from any NCR facility had been sold to one of GP's Michigan facilities (which no credible evidence has established), NCR cannot be held liable for the manufacture or sale of a useful product that NCR sold for value. See <u>Burlington N. & Santa Fe Ry. Co. v. United States</u>, 129 S. Ct. 1870, 1878-80 (2009); <u>see also</u> <u>G.J. Leasing Co. v. Union Elec. Co.</u>, 54 F.3d 379, 384 (7th Cir. 1995).

3

question that the Michigan Court is best situated to analyze the nature of *its own prior holdings*. NCR's statute of limitations defense will also require consideration of the Administrative Orders on Consent ("AOCs") to which GP has been a party; specifically, whether those AOCs are "administrative orders" within the meaning of § 9613(g)(3)(B). The Michigan Court is already closely familiar with the relevant facts giving rise to the AOCs, as it was overseeing litigation and enforcement proceedings at the Kalamazoo Site when each of those AOCs was issued.

Significantly, adjudication of NCR's statute of limitations defense will also require a determination concerning whether the work GP has conducted at the Kalamazoo Site qualifies as a "removal" or a "remedial" action. See 42 U.S.C. §9613(g)(2)(A), (B) (providing distinct statutes of limitations for each form of action). Such a determination plainly necessitates analysis of specific events throughout the complex history of at the Kalamazoo Site, including events relating to investigations, remedy selection, and removal and remedial actions.

These various analyses can be more efficiently and appropriately conducted by the Michigan Court; accordingly, transfer would facilitate prompt adjudication on this threshold issue of liability. See Regents of the Univ. of Cal. v. Eli Lilly & Co., 119 F.3d 1559, 1565 (Fed. Cir. 1997); United States v. Burns, No. 08-CV-3, 2008 WL 5263743, at *3 (N.D. W. Va. Dec. 18, 2008).

2. *Liability Defenses.*

If GP were able to overcome its heavy burden of establishing that NCR is liable as an arranger, NCR's liability defenses would also require factual analyses best suited to the Michigan Court. First, NCR's defense to GP's Section 107 claim would likely include challenges to whether the costs for which GP seeks recovery (1) are "necessary response costs" that (2) were incurred in a manner consistent with the National Contingency Plan. (See NCR Answer at 43.) Like the statute of limitations defense, these Section 107 defenses would

4

necessarily require consideration of the specific type of cleanup work that GP has done and the specific costs GP has incurred in Michigan.

Second, if NCR were found to have arranged for the disposal of hazardous substances in Michigan, any subsequent allocation of liability as between NCR and the other PRPs at the Kalamazoo Site also would require extensive consideration of Michigan-based facts and the detailed history of the Michigan Site. The Court would need to consider, for example, the percentage of GP's releases (if any) that in fact resulted from its alleged processing of broke and trim, as opposed to the processing of post-consumer wastepaper or other activities resulting in releases for which the Michigan Court has previously found GP liable.[4] See Envtl. Transp. Sys., Inc. v. ENSCO, Inc., 969 F.2d 503, 508-509 (7th Cir. 1992). That analysis would focus on the Michigan-based records of GP's Michigan facilities and the extent of GP's releases other than Aroclor 1242, which have already been the subject of extensive discovery in prior litigation before the Michigan Court. See, e.g., Kalamazoo River Study Grp. v. Rockwell Int'l Corp. ("KRSG"), 107 F. Supp. 2d 817, 837 (W.D. Mich. 2000).

The Court would also need to consider, *inter alia*, (1) the degree of care exercised by GP in processing its wastewater releases at the Kalamazoo Site; (2) the relative toxicity of GP's various releases at the Site; and (3) the parties' compliance with the responsible Michigan agencies and the U.S. Environmental Protection Agency ("EPA"). See Envtl. Transp., 969 F.2d at 508; see also Kerr-McGee Chem. Co. v. Lefton Iron & Metal Co., 14 F.3d 321, 326 (7th Cir.

---

[4] No documents, other than the unverified and contested ones submitted by GP with its Opposition Brief, have suggested that GP's releases at the Kalamazoo Site resulted from the recycling of broke and trim purchased from NCR. By contrast, countless documents – including ones signed by GP itself – specifically identify post-consumer office paper as the source of paperstock for the operations of GP and other companies that operated at the Kalamazoo Site. See, e.g., KRSG, 107 F. Supp. 2d at 828; ROD: OU 2 of the Kalamazoo Site (Willow Boulevard/A-Site Landfill) (Sept. 2006), at 6, 9, 14, available at http://www.epa.gov/region5/sites/kalproject; ROD: OU 3 of the Kalamazoo Site (King Highway Landfill) (Feb. 1998), available at http://www.epa.gov/superfund/sites/rods/fulltext/r0598098.pdf.

5

1994) (requiring consideration of the "totality of the circumstances" when determining a party's right to contribution). These factors also overwhelmingly turn on GP's past and current conduct in Michigan.

GP's argument that this Court would be best suited to conduct an equitable analysis of NCR's liability in this action misses the mark. As an initial matter, the Whiting Action involves alleged releases into the Lower Fox River, which are separate and distinct from the alleged releases into the *Kalamazoo River* at issue in this case. Moreover, this Court has not yet adjudicated NCR's purported arranger liability in the Whiting Action; indeed, as a result of phasing in that action, the issue of arranger liability has not even been the subject of full discovery.[5] And while the Court is familiar with the operations of the coating facilities of Appleton Coated Paper Company ("ACPC") and Combined Paper Mills, the Court has no familiarity with the operations of the other facilities at issue in this case.

## II. Relevant Evidence and Witnesses Are Located Predominately in Michigan.

The strong Michigan basis of GP's claims means that the potential sources of evidence in this case are located in Michigan, in addition to the many states where the other facilities are located. GP's representations to the contrary are disingenuous for a number of reasons.

---

[5] Although certain pending counterclaims in the Whiting litigation allege in part that NCR is liable as an arranger, those allegations cannot be decided on summary judgment because full discovery has not yet been taken on those claims. (See Plaintiffs' Brief in Opposition to P.H. Glatfelter and WTM I's Motion for Summary Judgment at 5-6, Appleton v. Whiting, No. 08-cv-16 (E.D. Wis. May 3, 2010) (Dkt. 969).) The Court's September 28, 2008 Case Management Order ("CMO") limited discovery in the Whiting Action to focus on (1) each party's knowledge of the risk that recycling CCP would result in environmental harm; and (2) what action each party took in response to that knowledge to avoid further PCB contamination. (See CMO at 8, Whiting, No. 08-cv-16 (Dkt. 252).) Arranger liability was not an issue in the Courts' December 16, 2009 Order dismissing Plaintiffs' contribution claims. (See Order at 23 n.20, Whiting, No. 08-cv-16 (Dkt. 795) ("This leaves aside the unanswered question of arranger liability.").)

6

First, GP's representation that NCR has purportedly identified 31 "Wisconsin-based" witnesses who have knowledge relevant to this case is entirely misleading. (See GP Br. at 10.) The EPA's 104(e) Request of February 9, 2010 ("EPA Request") asked NCR to "[i]dentify all persons having knowledge or information about the generation, transportation, treatment, disposal, or other handling of hazardous substances by you, your contractors, or by prior owners and/operators [*sic*]". (McAtee Decl. Ex. 1, No. 5.) NCR responded to that broad request with the names of individuals at the ACPC and Combined Paper facilities who possessed any potentially relevant knowledge concerning the general topics in the request. Nothing in the request or NCR's response suggests that the persons listed each had knowledge about the sale of broke and trim, or indeed that *any* of those persons had knowledge concerning the purported sale of broke and trim *to Kalamazoo*. See Century Consultants, Inc. v. Choctaw Racing Servs., LLC, No. 05-C-0494, 2005 WL 2671248, at *2 (E.D. Wis. Oct. 18, 2005) (Griesbach, J.) (granting transfer where it was "far from clear . . . whether the testimony from [several Wisconsin-based] witnesses would be relevant or admissible at trial").

Second, both the record to date and sheer common sense dictate that the primary sources of potential evidence concerning GP's alleged purchase of broke and trim will be in GP's Michigan facilities and with GP's Michigan employees. If it exists, relevant evidence concerning alleged arranger liability will include: (1) the amount of broke and trim purchased by GP's Michigan facilities (if any); (2) the price paid for such broke and trim; and (3) the relative volume of feedstock used by each facility that came from broke and trim (as opposed to post-

7

consumer materials). Simple logic dictates that this evidence is most likely to be located, if anywhere, in GP's Michigan facilities.[6]

By contrast, NCR has not found *any* records at any of its facilities evidencing sales of PCB-containing carbonless copy paper ("CCP") broke and trim to facilities along the Kalamazoo Site, despite diligent searches in response to the EPA's request. (See McAtee Decl. Ex. 1 (Resp. to EPA Request) at 1-2.) While GP relies heavily on an unsigned 1965 letter that was found in the British files of the company Wiggins Teape (see GP Br. at 12), the purported author of that letter, Mr. Heinritz, has denied writing the document and has stated in sworn testimony that he is unaware of *any* CCP broke or trim being sold to Kalamazoo facilities. (See McAtee Decl. Ex. 1 (Heinritz Dep., Jun 22., 2010) at 76:11-19, 80:7-14; see also McAtee Decl. Ex. 1 (Resp. to EPA Request) at 2.) Moreover, that letter was produced from the files of a third party (Wiggins Teape) in England, not Wisconsin, as GP is well aware. (See GP Br. at 3, 12.) NCR's repeated searches of its files in response to the EPA's request have not revealed any records demonstrating sales of broke and trim to Kalamazoo.

GP's reference to the affidavit of Gene Edgerton, a GP employee, merely supports the logical inference that potential evidence concerning GP's alleged purchases of broke and trim will primarily be located with GP. (See GP Br. at 12.) While Mr. Edgerton apparently now lives in Wisconsin, GP provides no reason to think that its other employees or potential witnesses live in Wisconsin, when they historically worked at GP's *Michigan* facilities. Moreover,

---

[6] Contrary to GP's argument, NCR can hardly be expected to provide an affidavit concerning the specific location of such evidence, when NCR has no basis to believe such evidence even exists. NCR has not yet had an opportunity to seek discovery from GP. Moreover, unlike GP, NCR has had no reason to investigate the sources of paperstock for GP's Michigan facilities. See Century Consultants, 2005 WL 2671248, at *3 (Griesbach, J.) (noting that likely witnesses at trial cannot always be determined at an early stage of proceedings and granting transfer to the more convenient forum).

8

documentary evidence relating to GP's historical purchases will almost certainly be located in GP's Michigan archives.[7]

  Third, GP ignores the fact that records and testimony related to the alleged sale of broke and trim from the three Wisconsin facilities would form at most a small fraction of the evidence potentially at issue in this case. GP's allegations involve the alleged sale of broke and trim from 13 other facilities outside Wisconsin. (See, e.g., Compl. ¶ 41.) As noted, factual evidence relevant to NCR's affirmative defenses relates almost entirely to Michigan, as does the evidence that would likely govern any allocation of liability. (See supra at 3-7.) And of course, the evidence pertaining to IP's liability will be entirely Michigan-based.

### III. The Michigan Court Is Best Positioned to Adjudicate the Case Efficiently and Quickly.

  It is axiomatic that the interests of justice are best served when an action is heard by the court that can resolve it most efficiently. See Forcillo v. LeMond Fitness, Inc., 220 F.R.D. 550, 554 (S.D. Ill. 2004). Transfer of this action to Michigan would effect that goal.

  A. The Michigan Court Is Already Well-Versed in the Relevant Facts.

  The Michigan Court is uniquely qualified to resolve the current action. After managing enforcement proceedings and other litigation relating to remediation of the Kalamazoo Site for over two decades, the Michigan Court is already familiar with the myriad issues relevant

---

[7] GP's repeated accusations that NCR has concealed evidence and thereby prevented GP from bringing this action sooner are both false and misleading. (See GP Br. at 3, 5-6, 19.) As noted, the 1965 letter to which GP refers was located in England in the possession of Wiggins Teape, a non-party over which NCR did not, and does not, have control. Moreover, GP's brief is the first time that NCR has heard of Mr. Edgerton's alleged purchase of broke and trim from any NCR facility, even though Mr. Edgerton has been employed by GP for the past *41 years.* (See Edgerton Decl. at ¶4). Mr. Edgerton was a GP employee throughout GP's extensive prior contribution lawsuit about the Site, during which GP did not once name NCR as a defendant. GP's accusations plainly ring hollow when GP has had access to Mr. Edgerton's testimony for over forty years.

9

to this action.  GP would have this Court decide questions of liability in a vacuum, without analyzing the long history of the Kalamazoo Site.

GP's efforts to downplay the Michigan Court's familiarity with the facts at issue in this case are misleading and should not be given credence by the Court.  As an initial matter, the prior Michigan litigation did *not* focus solely on entities that did not de-ink or recycle CCP.  (See GP Br. at 4-5.)  To the contrary, the Michigan Court exhaustively analyzed the activities of GP and the other members of the Kalamazoo River Study Group ("KRSG"), including by adjudicating extensive counterclaims filed against GP and the other KRSG members.  See, e.g., KRSG, 107 F. Supp. at 828-35.

Moreover, GP greatly understates the scope of the extensive litigation it has pursued in the Michigan Court when it attempts to describe that litigation as "one [case] filed . . . in 1995".  (GP Br. at 3-4.)  In reality, GP's litigation against the other Kalamazoo PRPs lasted for over nine years, and involved five fact-intensive trials, eight judgments and four fully-litigated appeals.  (See NCR Memorandum in Support of Its Motion to Transfer Venue at 3-4; see also Compl. ¶¶ 14-16, 20-25.)  GP's attempt to downplay the Michigan Court's involvement in this matter is unpersuasive.

Finally, contrary to GP's allegation, the Michigan Court continues to oversee matters concerning the Kalamazoo Site.  Remedial actions and enforcement activities at the Kalamazoo Site are ongoing in Michigan.  For example, a Consent Decree – to which GP is a party – was entered by the Michigan Court less than two years ago.  The Michigan Court retains jurisdiction over that Decree throughout the duration of its performance.  (See Consent Decree at 49, United States v. Georgia-Pacific, LLC, No. 1:09-cv-00429 (W.D. Mich. Sept. 30, 2009) (Dkt. 12).)  GP's reliance on Semiconductor Energy Laboratory Co. v. Samsung Electronics Co., No.

09-cv-1-bbc, 2009 WL 1615528, at *1-3 (W.D. Wis. June 9, 2009), where the prior litigation had involved wholly different issues and had ended *eleven years* earlier, is thus clearly misplaced.

      B.      <u>Adjudication by the Michigan Court Will Mitigate the Risk of Inconsistent Rulings Concerning the Kalamazoo Site.</u>

GP's argument that transfer would risk creating inconsistent rulings concerning NCR's alleged arranger liability misstates the true risk of inconsistent rulings in this case. (See GP Br. at 21.) As discussed above, this Court has not yet adjudicated NCR's alleged arranger liability in connection with the Lower Fox River Site, because the Case Management Order in <u>Whiting</u> precluded discovery concerning that issue during Phase 1. (See supra note 5.) Even if this Court is called upon to adjudicate NCR's alleged arranger liability in the future as part of the Lower Fox River Enforcement Action, that inquiry has not yet begun and, in any event, will focus on NCR's alleged sales of broke and trim to facilities at the *Lower Fox River Site*, not the Kalamazoo Site.

By contrast, GP's allegations raise significant factual and legal questions that risk inconsistent judgments with EPA's and the State of Michigan's ongoing enforcement of cleanup efforts at the Kalamazoo Site.[8] Those questions include, *inter alia*, whether NCR and IP should be held liable as PRPs at the Kalamazoo Site; whether prior cleanup efforts constitute removal or remedial actions; whether GP's costs at the Site were incurred in a manner consistent with the National Contingency Plan; and whether the equities warrant a departure from the Michigan Court's holding in the 1995 contribution action that GP and the other KRSG members should be liable for the "entire cost of response activities" at the Kalamazoo Site. <u>KRSG</u>, 107 F. Supp. 2d

---

[8] There can be little question that a government enforcement action, if one were to be brought, would take place in the Western District of Michigan, since that action would directly concern the ongoing cleanup of the Kalamazoo Site and likely could involve Michigan agencies. See EPA, Site Description, <u>available at</u> http://www.epa.gov/region5superfund/npl/michigan/MID006007306.htm (last updated Jul. 2010) (noting that both federal and state authorities are still addressing issues at the Kalamazoo Site).

11

at 840. The risk of inconsistent judgments on these important issues militates strongly in favor of transfer to the Michigan Court. In fact, one of the cases on which GP relies *grants* transfer for this very reason. See Melendrez v. Briery, No. 10-C-271, 2010 WL 2102832, at *2 (E.D. Wis. May 21, 2010).

The related principle of issue preclusion also weighs heavily in favor of transfer. The Michigan court can best determine which issues have already been resolved against GP and which aspects of liability for the cleanup have previously been assigned to other PRPs that are not currently parties to the instant case. Accordingly, transfer would avoid potential inconsistencies between this action and the prior Michigan cases.

    C.    <u>Transfer Would Best Protect Michigan's Interest in Having a Michigan Case Heard in a Michigan Forum.</u>

Michigan has a significant interest in the adjudication of liability and the payment of cleanup costs by the responsible parties at the Kalamazoo Site. GP is simply incorrect that this action will not involve questions about whether and how the Kalamazoo Site has been and should be cleaned up. (See GP Br. at 17.) As already discussed, these issues would necessarily arise if the action were ever to proceed to a damages phase. (See supra at 5.)

This factor is not only relevant, but particularly significant in an environmental dispute. See Nat'l Wildlife Fed'n v. Harvey, 437 F. Supp. 2d 42, 49-50 (D.D.C. 2006) (concluding that "the local interest in deciding local controversies at home" weighed heavily in favor of transfer). Michigan residents are far more concerned than Wisconsin residents about litigation related to a Michigan Site, and GP cannot sweep this important factor under the rug.

IV.    **GP Effectively Concedes That Its Choice of Forum Is Not Entitled to Any Weight.**

GP would have this court ignore the plain Michigan ties of this case in deference to GP's choice of forum. (See GP Br. at 15.) However, as noted in NCR's opening brief, the

12

deference on which GP seeks to rely is significantly diminished where the plaintiff's choice of forum (1) has a weak connection with the operative facts giving rise to the claim or (2) is not the plaintiff's home forum.  See Brady v. Hanger Orthopedic Grp., Inc., No. 05 C 0492, 2006 WL 2560953, at *2 (N.D. Ill. Aug. 30, 2006).  GP's argument fails on both counts:  the overwhelming majority of facts giving rise to this action have no connection to Wisconsin, and Wisconsin is not GP's home forum, as GP admits.[9]  (See GP Br. at 15.)  GP's selection of such a tenuously related forum should not be given deference.  Even the primary case on which GP relies supports this conclusion.  See Ziebell v. Deane, No. 08-cv-281-bbc, 2008 WL 3926383, at *6 (W.D. Wis. Aug. 21, 2008) (*granting* transfer to defendants' preferred district based on "the convenience of the parties and the interests of justice"); see also Century Consultants, 2005 WL 2671248, at *2 (Griesbach, J.) ("When the plaintiff has chosen a forum other than its own home, the assumption that the forum chosen by the plaintiff is more convenient is much less reasonable." (internal quotation marks omitted)).

V.  **IP's Limited Response Should Not Dissuade the Court from Transferring This Action to Its Proper Forum.**

The limited response submitted by IP provides further support for NCR's motion to transfer.  Although IP takes no position on whether Wisconsin or Michigan is the more convenient forum for adjudicating this action (IP Br. at 8),[10] the concrete facts it includes in its

---

[9] That GP has offices and facilities in Wisconsin and employs Wisconsin residents should not weigh against transfer, as GP also has numerous offices and facilities in Michigan and employs hundreds of Michigan residents.  Compare GP Br. at 16 & n.15, with GP Facility Directory: Michigan, available at http://www.gp.com/facilitydirectory/pdf/michigan.pdf (last visited Feb. 18, 2011).

[10] Based on its admittedly brief investigation of the facts giving rise to this action, IP suggests that NCR may not have adequately carried its burden of establishing why transfer should be granted.  (See IP Br. at 8.)  IP presumably would not have reached this conclusion if it were aware of the relevant issues.  In any event, it is for this Court – not IP – to assess whether NCR has met its burden.

13

brief are *all* Michigan-based.  IP admits that its *only* connection to this action is based on the alleged activities of three paper mills located *at the Kalamazoo Site*.  (See IP Br. at 2.)

IP offers no legitimate reasons why this action should not be transferred to Michigan:  it merely parrots the erroneous facts and unfounded assertions in GP's Opposition Brief.  Moreover, IP's conclusion that there is no "readily apparent" benefit to transferring this action rests on an apparent misunderstanding of the relevant issues.  (IP Br. at 2.)  For example, IP states that "the primary, if not sole, source of PCBs at the Kalamazoo Site was the de-inking and recycling of CCP alleged by Georgia-Pacific to have been almost exclusively arranged for disposal at the Site by NCR".  (IP Br. at 2-3.)  This assertion is clearly incorrect, as even a brief review of the readily available judicial and administrative records relating the Kalamazoo Site reveals.  IP is also apparently confused about NCR's involvement in prior litigation and access to sources of proof.  (See IP Br. at 5, 6.)  Like IP, NCR has *never* been a party to any litigation concerning the Kalamazoo Site.  Accordingly, none of IP's arguments weighs against transfer, whereas all of the relevant facts it identifies support transfer to the Michigan Court.

## CONCLUSION

For the foregoing reasons and those stated in NCR's Memorandum of Law in Support of Its Motion to Transfer Venue, NCR respectfully requests that the Court transfer this action to the United States District Court for the Western District of Michigan pursuant to 28 U.S.C. § 1404.

14

Dated: February 28, 2011 Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP,
 by
 /s/ Evan R. Chesler
 Evan R. Chesler

 Sandra C. Goldstein
 Darin P. McAtee
 Worldwide Plaza
 825 Eighth Avenue
 New York, NY 10019
 Phone: (212) 474-1000
 Fax: (212) 474-3700
 echesler@cravath.com

 *Attorneys for NCR Corporation*

OF COUNSEL:

 SIDLEY AUSTIN LLP
 Kathleen L. Roach
 Evan B. Westerfield
 One South Dearborn Street
 Chicago, Illinois 60603
 Phone: (312) 853-7000
 Fax: (312) 853-7036

 MARTEN LAW PLLC
 Linda R. Larson
 Bradley M. Marten
 1191 Second Avenue, Suite 2200
 Seattle, WA 98101
 Phone: (206) 292-2600
 Fax: (206) 292-2601

**CERTIFICATE OF SERVICE**

        I hereby certify that on February 28, 2011, I electronically filed Defendant NCR Corporation's Reply Memorandum in Support of Its Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) using the ECF system, which will send notification of such filing by operations of the Court's electronic systems. Parties may access this filing via the Court's electronic system.

                                                      /s/ Evan R. Chesler
                                                          Evan R. Chesler